# PRENTICE v. NORTHERN PACIFIC RAILROAD COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 319. Argued and submitted March 22, 1894. — Decided May 26, 1894.

When a deed contains a specific description of the land conveyed, by metes and bounds, and a general description referring to the land as the same land set off to B, and by B afterwards disposed of to A, the second de-

scription is intended to describe generally what had been before described by metes and bounds; and if, in an action of ejectment brought by a grantee of A, as plaintiff, the description by metes and bounds does not include the land sued for, it cannot be claimed under the general description.

THIS action of ejectment was brought September 7, 1883, to recover an undivided half of certain lands in the city of Duluth, county of St. Louis, Minnesota. Pursuant to a written stipulation of the parties the case was tried without a jury and upon the question of title alone, and resulted — Mr. Justice Miller and Judge Nelson concurring — in a judgment for the defendants. 43 Fed. Rep. 270.

The case made by the special finding of facts is substantially as follows:

The sixth section of article two of the treaty of the 30th day of September, A.D. 1854, 10 Stat. 1109, between the United States and the Chippewa Indians of Lake Superior and the Mississippi — ratified pursuant to a resolution of the United States Senate, passed on the 10th day of January, 1855, by the President on the 29th day of January, 1855 — whereby those Indians ceded to the United States certain territory lying adjacent to the headwaters of Lake Superior, contained the following provision, viz.: "And being desirous to provide for some of his connections who have rendered his people important services it is agreed that Chief Buffalo may select one section of land at such place in the ceded territory as he may see fit, which shall be reserved for that purpose, and conveyed by the United States to such person or persons as he may direct." p. 1110.

Under the provisions of the treaty and on the day of its date, Chief Buffalo, by an instrument of writing executed by him and filed in the office of the United States Commissioner of Indian Affairs at Washington, selected the land to be conveyed by the United States and appointed the persons to whom it was to be conveyed, indicating the selection and appointment, as follows: "I hereby select a tract of land one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St.

Louis Bay, Minnesota Territory, immediately above and adjoining Minnesota Point, and I direct that patents be issued for the same, according to the above-recited provision, to Shaw-Bwaw-Skung or Benjamin G. Armstrong, my adopted son; to Matthew May-Dway-Gwon, my nephew; to Joseph May-Dway-Gwon and Antoine May-Dway-Gwon, his sons, one quarter section to each."

Matthew, Joseph, and Antoine, under date of September 17, 1855, executed and delivered to Armstrong an instrument, assigning to him their right, title, and interest under 'the appointment and selection of Chief Buffalo. That assignment, after referring to the treaty and the above instrument of selection and appointment, provided:

"In consideration of the premises and of one dollar to us in hand paid by the said Benjamin G. Armstrong, the receipt whereof is hereby acknowledged, we do hereby sell, assign, and transfer, jointly and severally, all our right, title, interest, equity, claim, and property in and to the said land, and all our right and equity in and to the said instrument so made by the said Buffalo, jointly and severally, and our and each of our right and equity to have patents issued to us, according to the above-cited directions of the said Buffalo, and we hereby direct, jointly and severally, that patents issue to said Benjamin G. Armstrong accordingly."

This instrument of assignment was executed by Matthew, Joseph, and Antoine in the presence of and before the United States agent, and the United States interpreter.

Armstrong and wife, September 11, 1856, made, executed, and delivered to the plaintiff herein a deed of conveyance, the recited consideration being eight thousand dollars. The land so conveyed is thus described in the deed: "One undivided half of all the following-described piece or parcel of land, situate in the county of St. Louis and Territory of Minnesota, and known and described as follows, to wit: Beginning at a large stone or rock at the head of St. Louis River Bay, nearly adjoining Minnesota Point, commencing at said rock and running east one mile, north one mile, west one mile, south one mile to the place of beginning, and being the

land set off to the Indian chief Buffalo at the Indian treaty of September 30, A.D. 1854, and was afterwards disposed of by said Buffalo to said Armstrong, and is now recorded with the government documents, together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof," etc. This deed, sealed and delivered in the presence of a justice of the peace of Wisconsin, was acknowledged by the grantors on the day of its execution before that officer, whose official character was certified by the clerk of the Circuit Court of the county where the acknowledgment was made. It was not certified to have been acknowledged in accordance with the laws of Wisconsin. The deed was duly recorded in the county of St. Louis, Territory of Minnesota, on the 4th day of November, A.D. 1856.

Armstrong and wife, on the 27th day of August, 1872, executed and delivered to the plaintiff a confirmatory deed, which was duly recorded in the county of St. Louis, State of Minnesota, September 2, 1872. That deed was in these words:

" Whereas on the eleventh day of September, in the year one thousand eight hundred and fifty-six, we, Benjamin G. Armstrong and Charlotte Armstrong, wife of aforesaid Benjamin G. Armstrong, conveyed by a quitclaim deed to Frederick Prentice, of Toledo, Ohio, the undivided one-half part of all our interest in certain lands situated at or near the head of St. Louis Bay, and intended to describe our interest in what is known as the Chief Buffalo tract, at the head of St. Louis Bay, Minnesota Territory, and then believing that the description in said deed would cover or was the tract that would be patented to us by the United States of America, according to said Buffalo's wishes and a contract we held from the heirs of said Buffalo, but, to definitely fix upon the lands designed to be conveyed, it was stated in said deed to be the land set off to the Indian chief Buffalo at the Indian treaty of September thirtieth, in the year one thousand eight hundred and fifty-four; and, further, I, the said Armstrong, gave a contract on the tenth day of September, in the year

one thousand eight hundred and fifty-six, to the said Frederick Prentice, binding ourselves and heirs to give said Frederick Prentice any further writing or instrument he might require.

"And on the first day of July, in the year one thousand eight hundred and fifty-seven, I, Benjamin G. Armstrong, and Charlotte Armstrong agreed to and did sell to Frederick Prentice the other one-half of said Buffalo tract, for which said Frederick Prentice paid us something over two thousand ($2000) dollars, and since that time has paid us to our full satisfaction for the whole property, and we agreed to and do by these presents confess payment in full for the whole of the above tract, in compliance of the first deed for the one undivided half and the carrying out of the contract to sell the balance July first, in the year one thousand eight hundred and fifty-seven, this is intended to cover the land deeded by us to the said Prentice in the deed given on the eleventh day of September, one thousand eight hundred and fifty-six, and recorded in liber A of deeds, page 106, at Duluth, State of Minnesota, and the land included in the contract of the first of July, eighteen hundred and fifty-seven, and intended to cover the lands as described in patents from the United States of America to Benjamin G. Armstrong, Matthew May-Dway-Gwon, Joseph May-Dway-Gwon, and Antoine May-Dway-Gwon, and described as follows: To Benjamin G. Armstrong the west half of the southwest quarter and the lot number five (5) of section twenty-seven, and lot No. three (3) of section thirty-four, containing together (182.62) one hundred and eighty-two and sixty-two one-hundredths acres; and to Joseph May-Dway-Gwon the southeast quarter of section twenty-eight, containing one hundred and sixty acres; and Antoine May-Dway-Gwon the east half of the northeast quarter of section twenty-eight and the west half of the northwest quarter of section twenty-seven, containing one hundred and sixty acres.

"And to Matthew May-Dway-Gwon the southwest quarter of section twenty-two, containing one hundred and sixty acres, all of the above being in township fifty north of range fourteen west of the fourth principal meridian, State of Minnesota, and

the three last-named pieces of land have since been deeded by the said Matthew, Joseph, and Antoine May-Dway-Gwon to Charlotte Armstrong, but previous to the date of said deeds the above-named Joseph, Matthew, and Antoine May-Dway-Gwon had assigned or transferred all their right, title, and interest therein to the said Benjamin Armstrong. I, the aforesaid Benjamin G. Armstrong, did sell by deed and contract to Frederick Prentice, which I, the said Charlotte Armstrong, knew at the time, but did not know but that by getting another deed or conveyance after the patents were issued we could sell the property, but am now satisfied that we had sold and assigned all our right, title, and interest to Frederick Prentice previous to our deeding to any other person or persons, and that we had no right to deed or convey to any other person or persons, as the title to the lands above described was then virtually and by right vested in the said Frederick Prentice, and that the first deed for the one-half and the contract for the remaining half of said land, with the payment thereon made at the time by the said Frederick Prentice, bound us to give him good and sufficient deeds to said property whenever so demanded; and we do hereby assign and quitclaim all our right, title, and interest now or at any time held by us to all the above-described property in fulfilment of our agreement with the said Frederick Prentice."

The tract of land which Chief Buffalo had designated as his selection on the day of the treaty did not correspond with the section lines when the land came to be surveyed into sections, and part of it was found to be occupied and claimed by certain Indian traders under the treaty. After a lengthy correspondence and investigation in the Department of the Interior, the relatives of Buffalo, entitled to the land reserved for them, conceded the validity of the claims of these Indian traders, and, in lieu of the lands thus held by them, received other lands adjacent to that selected by Buffalo to make up the quantity of six hundred and forty acres, but not in the form of a parallelogram, though maintaining a continuous connection.

A report of the Secretary of the Interior to the President,

under the date of September 21, 1858, and made part of the findings, contained, among other things, the following :

"Now, therefore, under all the circumstances of the case, it having been fully proved that these relatives of the Chief Buffalo acquiesce in the selection made for them by Agent Gilbert, and desire that patents should issue to them for this land, and the Commissioner of Indian Affairs having recommended such approval, I have respectfully to request that you will approve the same in order that patents may issue in accordance with their request as follows, viz.: To Matthew May-dway-gon, S. W. ¼ sec. 22, T. 50 N., R. 14 W. — 160 acres; To Antoine May-dway-gon, E. ½ N. E. ¼ sec. 28 and W. ¼ N. W. ¼ sec. 27, T. 50 N., R. 14 W. — 160 acres; to Joseph May-dway-gon, S. E. ¼ sec. 28, T. 50 N., R. 14 W. — 160 acres; to Shaw-bwaw-skung or Benjamin G. Armstrong, W. ½ S. W. ¼ sec. 27, lot No. 3, sec. 34, lot No. 5, sec. 27, 182.62."

The patent to Armstrong, issued October 23, 1858, contained the following recitals and description of the land embraced by it:

"Whereas it appears from a return dated the twenty-seventh day of September, one thousand eight hundred and fifty-eight, from the office of Indian Affairs to the General Land Office, that there has been selected and approved for ' Shaw-Bwaw-Skung, or Benjamin G. Armstrong,' as one of the ' connections ' of said Chief Buffalo, the west half of the southwest quarter and lot number five, both of section twenty-seven, and lot number three of section thirty-four, containing together one hundred and eighty-two acres and sixty-two hundredths of an acre, all in township fifty north, of range fourteen west, of the fourth principal meridian, in the State of Minnesota. Now, know ye, etc."

The parties, at the trial, entered into the following stipulation :

"It is admitted for the purposes of the trial of the above-entitled action that the land in dispute described in complaint of plaintiff herein is part of the land described and included in the patent of the United States to Benjamin G. Armstrong,

dated October 23, 1858, and recorded in book 'B,' at page 500, in the office of the register of deeds of St. Louis County, Minnesota; that the defendants are in possession of the specific portions of said land described in their respective answers herein, and as respects the Northern Pacific Railroad Company is in possession of the certain portions of said land colored blue upon the map hereto attached, and that all the defendants assert title to said respective portions derived from a certain deed made and executed by Benjamin G. Armstrong and wife to John M. Gilman, dated August 31, 1864, and recorded in the office of the register of deeds of St. Louis County, Minnesota, September 12, 1864, in book 'C' of deeds, at page 665, and from certain other deed made and executed by Benjamin G. Armstrong and wife to Daniel S. Cash and James H. Kelly, bearing date October 22, 1859, and filed for record in the office of the register of deeds in and for said St. Louis County January 5, 1860, and thereafter recorded in book 'C' of deeds, at page 206; that the said defendants have succeeded to whatever title or right said Kelly and Cash and said Gilman obtained by virtue of said deeds, respectively, in and to the premises in dispute; that at the commencement of this suit said defendants withheld said premises and the rents, issues, and profits of the same from said plaintiff, although they had theretofore been requested to admit him to the possession of an undivided half ($\frac{1}{2}$) of said premises and the rents and profits thereof; that the undivided half ($\frac{1}{2}$) of the portion of the premises described in said complaint claimed by each of said defendants is worth fifty thousand dollars ($50,000) and upwards." The court found the facts in accordance with this stipulation.

The United States government surveys of the lands ceded by the treaty of September 30, 1854, to the United States had not been made at the date of the deed from Armstrong to plaintiff and were not made until the year following that date.

Gilman took the above conveyance without actual notice of the deed from Armstrong to the plaintiff of September 11, 1856, or that plaintiff claimed an interest in the land so conveyed to him.

The defendants herein claim title to the pieces or parcels of land in controversy as grantees of Gilman and under and through the deed to Gilman of August 31, 1864.

The large stone or rock at the head of St. Louis River Bay, nearly adjoining Minnesota Point, described in the deed from Armstrong to Prentice, is the beginning of the boundary of the tract conveyed, is well identified, and was generally known to the few people familiar with the place, and was recognizable at the time of the trial below, and a mile square measured from that point as called for in the deed would wholly depart from the shore of St. Louis Bay and would cover about one-half or three-fifths land, and the remainder the water of Lake Superior.

The land selected by Chief Buffalo lay upon the shore of St. Louis Bay, immediately adjoining Minnesota Point, and this selection was followed as near as it could be by the patents of the United States issued to satisfy that reservation, considering the elimination from the mile square of the lands held by the traders, and the vagueness of Buffalo's description, and the necessity of conforming the final grant to the surveys of the United States.

If the lines of the course called for as east and west in the deed of Armstrong to Prentice, under which the plaintiff asserts his title, were exactly reversed, the description in that deed would include a large part of the land actually selected by Chief Buffalo, and also included in the patents from the United States. But it would not include the land sued for in this action.

The instrument executed by the Chief Buffalo, dated September 30, 1854, was the only selection or appointment ever made by him under the sixth clause of the second article of the said treaty.

Chief Buffalo died in the month of October, 1855.

At the date of the deed to Prentice, of September 11, 1856, Armstrong did not have any interest in land in St. Louis County, Minnesota Territory, except what he was entitled to under the Buffalo selection and appointment above referred to, and under the above assignment from the other.

The conclusions of law found by the Circuit Court were —

That the appointment of persons to whom the United States were to convey the section of land reserved by the above provision of said treaty, made by Chief Buffalo on the 30th day of September, 1854, was a valid and sufficient appointment under that provision, and, upon the ratification of the treaty, vested in Armstrong and the other appointees named such an interest as the treaty gave to the land so reserved;

That the patent of the United States to Armstrong and his acceptance of it was a valid execution of the treaty on that subject;

That the deed from Armstrong to plaintiff, of September 11, 1856, was, in its execution, acknowledgment, and recording, a valid and sufficient deed, and its record constructive notice of its contents;

That the description in the deed of Armstrong to plaintiff of September 11, 1856, is insufficient to convey his interest in or title to any other or different tract of land to which he might have been entitled under said treaty than the tract described therein, and that said deed is ineffectual as a conveyance to plaintiff of any interest or title except such as Armstrong had in or to the land therein described, and that plaintiff took no title under it to the land for the possession of which this action is brought;

That the quitclaim deed from Armstrong to Gilman of August 31, 1864, conveyed to the latter such interest, and no more, as Armstrong had in the land therein described at the date of said deed; and

That the plaintiff is not entitled to recover in this action, and judgment must go in favor of the defendants for their costs and disbursements.

*Mr. Elihu Root*, (with whom were *Mr. John F. Dillon* and *Mr. Samuel B. Clarke* on the brief,) for plaintiff in error.

*Mr. William W. Billson*, for Fargusson, defendant in error, submitted on his brief.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

The court below correctly interpreted the decision in *Prentice* v. *Stearns*, 113 U. S. 435, as holding that the deed from Armstrong to Prentice, under which alone the latter can assert a title to the land in controversy, was an instrument designed to convey a defined tract or parcel of land, not any possible interest existing in Armstrong under the treaty with the Chippewas, the selection of Buffalo, and the appointment that the lands selected by him should be conveyed to Armstrong and other named relatives.

This question was reargued in the court below, in the present case, in the light of additional facts supposed to have been adduced.

Mr. Justice Miller, in his opinion in this case, said: "We remain of the opinion we were on the former trial. The first descriptive clause of the deed from Armstrong to Prentice is of a tract of land a mile square, beginning at a large stone or rock, which, as a matter of fact, we find in the present case is now identified, and was well known at the time the deed was made. The description proceeds with the points of the compass one mile east, one mile north, one mile west, one mile south, to the place of beginning. It would be difficult, the beginning point being well ascertained, to imagine that Armstrong intended to convey any other land, or any other interest in land, or interest in any other land, than that so clearly defined. And if that description is to stand as a part of the deed made by Armstrong to Prentice, it leaves no doubt where the land was; and there is no occasion to resort to any inference that he meant any other land than that. It is now found as a fact, that this boundary would include a surface from one-half to three-fourths of which is land, and the remainder is water of Lake Superior." 43 Fed. Rep. 270, 274.

The specific description by metes and bounds of the land conveyed by the Armstrong deed to Prentice, namely, " one undivided half of all the following-described piece or parcel of land, situate in the county of St. Louis and Territory of Minnesota, and known and described as follows: Beginning at a large stone or rock at the head of St. Louis River Bay, nearly adjoining Minnesota Point, commencing at said rock

and running east one mile, north one mile, west one mile, south one mile to the place of beginning," does not, it is conceded, embrace the land in dispute.     Indeed, the plaintiff insists, on several grounds, that that description should be rejected altogether, as inaccurate and mistaken.   And he is driven to rest his claim of title to the lands in dispute upon the clause of the deed, immediately following the words, above quoted, namely, "and being the land set off to the Indian Chief Buffalo, at the Indian treaty of September 30, 1854, and was afterwards disposed of by said Buffalo to Armstrong, and is now recorded with the government documents."

But the plaintiff, although compelled to rely upon the words last quoted, insists that they mean what, in our opinion, is not justified by a fair interpretation of them.   It seems entirely clear that the words in the clause beginning "*and being the land,*" etc., were intended to describe, generally, what had been before specifically described by metes and bounds; that "*and being*" is equivalent to "which is," in which case this clause of general description — the specific description by metes and bounds being rejected as not embracing the land — cannot, it is conceded, be regarded as an independent description of the subject of the conveyance.

It is said that the deed should not be construed as intended to convey merely a specific tract, and thereby make it inoperative, because, at the time it was executed, Armstrong did not have any interest in a specific tract that he could convey, but only a general right, under the Buffalo document, to have land located and patented to him by the United States. Referring to the argument made by counsel in support of this view, Mr. Justice Miller said, p. 274 : " They say that the reference to the land set off to the Indian Chief Buffalo at the treaty of 1854 meant, not any definite piece of land, but any land which might come to Buffalo or his appointees, of whom Armstrong is one, by the future proceedings of the government of the United States in that case; and that, no matter where such land was found, provided it was within the limits of the land granted by the Chippewa treaty, then the deed from Armstrong to Prentice was intended to convey

such after-acquired interests which were patented to the parties by the United States. We do not see anything in the whole deed or transaction between Armstrong and Prentice that points to or indicates any such construction of it. Both clauses of the description are definite as to the land conveyed, and treat it as a piece of land well described, well known, and well defined. Of course, any man endeavoring to ascertain what land was conveyed under that grant would suppose that, when he found the stone or rock, which we now as a matter of fact find to have an existence, and can be well identified, he had bought a mile square according to the points of the compass, the southwest corner of which commenced on that rock. He would not suppose that he had bought something that might be substituted in lieu of that mile square by future proceedings of the government of the United States. And so with regard to the other description. Buffalo had made his selection, had described the land which he designed to go by that treaty, not to him, but to his relatives, whose names are given, and it was an undivided half of this land thus selected by the Buffalo chief, and not other land, or different land which might come to Armstrong, that he conveyed and intended to convey to Prentice."

After distinguishing this case from *Doe* v. *Wilson*, 23 How. 457, and *Crews* v. *Burcham*, 1 Black, 352, Mr. Justice Miller proceeded, p. 275, 276: "But in the case before us, not only had Buffalo made his selection, and designated the parties to whom the land should go, but the selection had definiteness about it to a certain extent; it was a thing which could be conveyed specifically, and which Armstrong undertook to convey specifically. It is not necessary that we resort to the supposition that Armstrong was talking about some vague and uncertain right — uncertain, at least, as to locality and as to its relation to the surveys of the United States — which he was intending to convey to Prentice, instead of the definite land which he described or attempted to describe. If such were his purpose in this conveyance, it is remarkable that he did not say so in the very few words necessary to express that idea, instead of resorting to two distinct descriptive clauses, neither

of which had that idea in it, one of which is rejected absolutely by the plaintiff's counsel as wholly a mistake, and the other is too vague in its language to convey even what plaintiff claimed for it. We are not able, therefore, to hold with counsel for plaintiff, that, if this conveyance does not carry the title to any lands which can be ascertained by that description in the deed, resort can be had to the alternative that the deed was intended to convey any land that might ultimately come to Armstrong under the treaty, and under the selection, and under the assignment to Buffalo."

We are entirely satisfied with these views. It results that neither the description by metes and bounds, nor the general description of the lands conveyed by the deed under which the plaintiff claims, is sufficient to cover the lands here in dispute.

Another matter deserves notice. It is found as a fact that if the lines of the course called for as east and west in the deed of Armstrong to Prentice, under which the plaintiff asserts title, were exactly reversed, the description in the deed would include a large part of the land actually selected by Buffalo Chief, and also included in the patents from the United States. But this fact is immaterial, for it is found that if the course were reversed, as suggested, it would not include the particular lands here in controversy.

The case then is this: Looking into the deed, under which the plaintiff claims title, for the purpose of ascertaining the intention of the parties, we find there a specific description, by metes and bounds, of the lands conveyed, followed by a general description which must be held to have been introduced for the purpose only of showing the grantor's chain of title, and not as an independent description of the lands so conveyed. As neither description is sufficient to cover the lands in suit, there can be no recovery by the plaintiff in this action of ejectment, whatever may be the defect, if any, in the title of the defendants. If this were a suit in equity to compel a reformation of the deed upon the ground that, by mistake of the parties, it did not properly describe the lands intended to be conveyed, and if such a suit were not barred

by time, a different question would be presented upon the merits.

What has been said renders it unnecessary to consider whether the deed from Armstrong and wife to Prentice was so acknowledged and certified as to entitle it under the laws of Minnesota to record in that State, and, by such record, become legal notice of its contents to Gilman and those claiming under him.

We perceive no error in the record to the prejudice of the plaintiff in error, and the judgment is

*Affirmed.*