## FAXON v. UNITED STATES.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 119. Argued March 18, 1898. — Decided May 31, 1898.

In order to the confirmation of any claim, the Court of Private Land Claims, under the act of March 3, 1891, c. 539, 26 Stat. 854, creating that tribunal, must be satisfied not merely of the regularity in form of the proceedings, but that the official body or person, assuming to make the grant, was vested with authority, or that the exercise of power, if unwarranted, was subsequently lawfully ratified; and the same rule applies to this court on appeal.

The Court of Private Land Claims held, in this case, that if the lands which are the subject of controversy belonged to the class of temporalities, it was clear that the treasurer of the department had no power to make a sale by his sole authority, whether the value exceeded five hundred dollars or not; and if the lands did not belong to that class, nevertheless, there was the same want of power under the laws of Mexico in relation to the disposition of the public domain. This court, concurring with the Court of Private Land Claims, further holds that this is not a case in which the sale and grant can be treated as validated by presumption.

THREE separate petitions were filed in the Court of Private Land Claims for the confirmation of what was commonly called and known as the Tumacácori, Calabazas and Huebabi grant, situated in the valley of the Santa Cruz River, Pima County, Arizona, the petitioners in each claiming under the original grantee. The causes were consolidated and tried under the petition of William Faxon, Jr., trustee, and others. The petition alleged that the claimants were the owners in fee of the tract of land in question under and by virtue of a certain instrument in writing, dated April 19, 1844, "made and executed by the treasury department of Sonora in compliance with the law of the Mexican Congress of the 10th of February, 1842, providing for the denouncement and sale of abandoned pueblos," running to Don Francisco Alejo Aguilar, to whom said treasury department sold the tract April 18, 1844, for the sum of five hundred dollars.

That in the year 1806, the governor of the Indian pueblo

of Tumacácori petitioned Don Alejo Garcia Conde, intendente of the province, etc., etc., to issue to the Indians of the pueblo a grant of lands for the "fundo legal" and also for the "estancia" of the pueblo to replace ancient title papers which had been lost or destroyed; that in accordance with that petition the lands mentioned were ordered to be surveyed, which was done, and the boundary monuments established, by Don Manuel de Leon, commandante of the presidio of Tubac; that on April 2, 1807, the said intendant Conde issued a royal patent or title to the Indians of the pueblo of Tumacácori for the lands, as set forth in the proceedings of the survey thereof and in the copy of the original expediente.

That under the law of the Mexican Congress of February 10, 1842, Don Francisco Aguilar, on April 18, 1844, became the owner by purchase, as before mentioned, "of the four square leagues of agricultural and grazing lands of the 'fundo legal' of the abandoned pueblo of Tumacácori and the sitios of the estancia (stock farm) of Calabazas, and the other places thereunder pertaining." It was averred that all the steps and proceedings in the matter of the grant and sale were regular, complete and legal and vested a complete and valid title in fee in the grantee; and that the grantee at the time went into actual possession, use and occupation of the grant and erected the proper monuments thereon, and that he and his legal representatives have continued ever since and until the present time in the actual possession, use and occupation of the same, and are now possessed and seized in fee thereof.

The United States answered alleging that the alleged sale to Aguilar was without warrant or authority of law and void; that, if these lands had been theretofore granted to the pueblo of Tumacácori, they were abandoned about 1820, and by virtue thereof became public lands; that the title to said property, if any passed in 1807, was purely usufructuary, and vested no estate, legal or equitable, in the said pueblo or mission, but that the same and the right of disposition were reserved to and remained in the national government.

The answer denied that Aguilar became the owner by purchase or otherwise of any lands included in the alleged grant

of 1807 to the pueblo, or of any land of that mission or its dependencies; that the alleged grant was ever located and recorded as provided by the sixth article of the treaty of Mesilla (Gadsden purchase); that the original grantee or grantees were ever owners of the property as against the Republic of Mexico, or are now the owners thereof as against the United States or its grantees; that the grantee Aguilar, in the year of 1844, went into actual possession and occupation of the grant, and erected monuments thereon, or that he and his representatives have continued ever since in the actual possession, use and occupation of the same.

The answer averred that the proceedings for sale were never taken under the express order or approval of the general government, and never submitted to said general government for ratification or approval; that the lands claimed far exceeded those contained in the original survey; that the sale was by quantity and limited; and that the alleged grant was so indefinite and uncertain as to description as to carry no title to any land.

On the hearing the testimonios of the grants of 1807 and of 1844 were put in evidence. Evidence was adduced to the effect that Aguilar, the original grantee, never took or had possession of the lands; that he was the brother in law of Manuel Maria Gandara, who was the governor of Sonora in 1842, and in 1845 to 1853, except a few months; to whom Aguilar conveyed in 1856, and, more formally, in 1869; that Gandara was in possession in 1852, 1853, 1854 and 1855, through his herdsmen; and that, as contended by counsel for petitioner, the money for the purchase was furnished by Gandara, and Aguilar took the title as trustee for him. Apparently the *expedientes* were not in the archives, nor was there any note of the grant in the book of *toma de razon* for 1844.

A translation of the titulo of 1844 is given in the margin.[1]

---

[1] Treasury of the Department of Sonora, 1844.

Title of sale, transfer and adjudication of agricultural lands which include the four leagues of the fundo legal of the deserted pueblo of Tumacácori and the two sitios of its estancia (stock ranch) of Calabazas and the other places thereto annexed, the same being situated in the jurisdiction

The Court of Private Land Claims rejected the claim on the ground that the sale in question was void for want of power on the part of the officer attempting to make it.

---

of the District of San Ignacio, issued by the said departmental Treasury in compliance with the supreme decree of the 10th of February, 1842, in favor of Don Francisco Alejandro Aguilar, a resident of the port and village of San Fernando de Guaymas.

Second Seal.                     Seal.                     Four Dollars.

Eighteen hundred and forty-four and eighteen hundred and forty-five.

Ignacio Lopez, captain of cavalry retired to the infantry, honorary intendant of the army and treasurer of the Department of Sonora.

Whereas the supreme decree of February 10, 1842, provides for the sale, on account of the critical condition of the public treasury, of the properties pertaining to the department of temporalities, of which class are the farming lands and the lands for breeding cattle and horses respectively of the four leagues of the townsite of the depopulated town of Tumacácori and the two sitios of the stock farm of the same at the points of Huebabi, Potrero, Cerro de San Cayetano and Calabazas, whose areas, boundaries, monuments and coterminous tracts are stated in the corresponding proceedings of survey executed in the year 1807 by the commissioned surveyor, Don Manuel de Leon, veteran ensign and late commandant of the presidio of Tubac, according to the information obtained in relation thereto at the instance of this departmental Treasury, said temporal farming and grazing lands being valued in the sum of five hundred dollars, as provided in article 2d of the aforesaid supreme decree of February 10, 1842; and complying punctually therewith I have ordered the formation of the corresponding expediente by the Court of First Instance and of the Treasury of the District of San Ignacio, during which proclamations (pregones) no bidder appeared; therefore, and in compliance with article 73 of the law of April 17, 1837, as the sale in question on account of the national Treasury does not exceed five hundred dollars, this said Treasury proceeded to the public sale of the aforementioned lands of the depopulated Tumacácori and the lands of its stock farm, Calabazas, and other annexed points, all belonging to the department of temporalities, on the 16th, 17th and 18th of the current month of April, in solicitation of bidders, without there being any other than Don Francisco Alejandro Aguilar, a merchant and resident of this port and village of San Fernando de Guaymas, for said sum of five hundred dollars, the appraised value at which said temporalities have been sold, as appears from the third and last offer, which literally is as follows:

"Third Seal.               One dollar.          Years 1844 and 1845.

"In the port and village of San Fernando de Guaymas, on the eighteenth of April, eighteen hundred and forty-four, I, the undersigned, departmental Treasurer, being in the office of this Treasury under my charge, with my attendant witnesses, Don Jose Maria Mendoza and Don Vicente Irigoyen, in the absence of a Notary of the Treasury and of a Notary Public, in compli-

*Mr. Francis J. Heney* for appellant.

*Mr. Special Assistant Matthew G. Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

---

ance with the provisions of Article 73 of the law of April 17, 1837, since the price or value of the temporalities to which these proceedings relate do not exceed five hundred dollars, ordered that the third and last offer be made for the final sale of the temporal lands of Tumacácori and Calabazas referred to in this expediente and that to that end a proclamation be made to the public at the sound of the drum, as, in effect, the public crier, Florentino Baldizan, made in a high and clear voice, saying : ' The Treasury of the Department is going to sell, on account of the national Treasury and in accordance with the supreme decree of February 10, 1842, the agricultural lands and lands for raising cattle and horses which comprise the four leagues of the townsite of the depopulated town of Tumacácori and the two sitios of the depopulated stock farm of the same at the points of Huebabi, Potrero, Cerro de San Cayetano and Calabazas, situated in the District of San Ignacio, the areas, monuments, boundaries and coterminous tracts of which are stated in the corresponding proceedings of survey executed in the year 1807 by the commissioned surveyor, Don Manuel de Leon, veteran Ensign and late Commandant of the presidio of Tubac, as appears from the information obtained at the instance of said departmental Treasury, from which it also appears that the original titles of grant and confirmation of said temporalities still exist, which temporalities have now been valued at five hundred dollars in accordance with Article 2d of said supreme decree of February 10, 1842.

" Whoever desires to make a bid come forward and make it to this departmental Treasury, where it will be received in conformity with the laws, with the understanding that the final sale is to be made now to whomever should be the highest bidder."

In which act Don Francisco Alexandro Aguilar, a merchant and resident of this port, appeared and made the bid of five hundred dollars, at which said temporalities are appraised; and no other bidder having appeared and the hour for midday prayer of this day having already struck, the public crier finally said : " Once, twice, three times; sold, sold, sold; may it do good, good, good to Don Francisco Alejandro Aguilar."

In these terms this act was concluded, the aforesaid farming lands and lands for raising cattle and horses of the depopulated townsite and stock farm of the temporalities of Tumacácori and Calabazas being publicly and solemnly sold to Don Francisco Alexandro Aguilar, a merchant and resident of this port, for the sum of five hundred dollars.

And in due witness thereof and for the usual purposes these proceedings were closed and entered and I signed them together with the party in interest and my undersigned attendant witnesses.

Witness: JOSE MARIA MENDOZA.                IGNACIO LOPEZ.
Witness: VICENTE IRIGOYEN.                   FRANCISCO A. AGUILAR.

MR. CHIEF JUSTICE FULLER, after stating the case as above, delivered the opinion of the court.

In order to the confirmation of any claim, the Court of

---

In which legal terms was concluded the sale of the farming lands and lands for raising cattle and horses, which comprise the four leagues of the depopulated townsite of Tumacácori and the two sitios of its stock farm, Calabazas, and other annexed points, all temporalities, situated in the jurisdiction of the District of San Ignacio, the original expediente remaining deposited in the archives of this Treasury as perpetual evidence, with the understanding that when the original titles of Tumacácori and Calabazas are obtained, they shall be aggregated to the present one.

Whereas the agricultural lands and lands for raising cattle and horses, which comprise the four leagues of the depopulated town of Tumacácori and the two sitios of its stock farm of Calabazas and other annexed points, all temporalities, in the jurisdiction of the District of San Ignacio, have been sold to Don Francisco Alejandro Aguilar, a resident and merchant of this port, for the sum of five hundred dollars, which sum together with the others pertaining to the Treasury, he has paid into this departmental Treasury, I, therefore, in use of the powers the laws on the matter, as also the supreme decree of the 10th of February, 1842, conceded to me, by the present title and in the name of the Mexican Nation and of the Supreme Government formally cede, sell, give and adjudicate the said farming lands and lands for raising cattle and horses, which comprise the four leagues of the depopulated townsite of Tumacácori and the two sitios of its stock farm of Calabazas and other annexed points already mentioned to the said purchaser, Don Francisco Alejandro Aguilar, by way of sale, and with all the qualities, solemnities, firmness and subsistence the law establishes, for himself, his heirs, children and successors, with all their entrances, exits, lands, timber, groves, shrubs, pastures, centres, circumferences, waters, springs, watering places, uses, customs, servitudes and other things pertaining to said possessions, with their enclosures, metes and bounds for the sum of five hundred dollars, at which they have been sold to said Francisco Alejandro Aguilar, with the precise condition that the said buyer, and his successors in their case, are to maintain the above mentioned agricultural lands and lands for raising cattle and horses that comprise the four leagues of the depopulated townsite of Tumacácori and the two sitios of its stock farm of Calabazas populated, possessed, cultivated and protected, without passing beyond their metes and bounds and without their being totally abandoned; with the understanding that if the said abandonment and depopulation of said farming and grazing lands should take place for the space of three consecutive years, by the neglect or fault of their owners or possessors and there should be any person who denounces them, in such event after verification of the fact, they shall be declared public lands

Private Land Claims, under the act creating that tribunal, (26 Stat. 854, c. 539,) must be satisfied not merely of the regularity in form of the proceedings, but that the official body or person assuming to make the grant was vested with

and shall be sold at public sale, on account of the National Treasury, to whomever should be the highest bidder, excepting, as is just, those cases where the abandonment, depopulation or lack of protection are on account of the notorious invasion or hostilities of enemies or epidemics or other like causes, and only for the period or periods of such occurrences, cautioning as the aforesaid Don Francisco Alejandro Aguilar and his successors are strictly cautioned that they are to restrict themselves to the belongings, metes and bounds of the aforesaid agricultural and grazing lands of the townsite of Tumacácori and its stock farm of Calabazas, constructing and maintaining on said possessions the necessary monuments of stone and mortar under the penalties established by the laws in case of neglect.

And with the powers, which they and the divers superior provisions that govern the matter, concede and confer on me, I order and require repectively of the Judges, Justices and local authorities that at present are and shall hereafter be in the District of San Ignacio, that, for the sake of the good and prompt administration of justice and in observance of the aforesaid legal provisions they do not permit the said Francisco Alejandro Aguilar nor his successors to be, in any manner, disturbed, annoyed or molested in the free use, exercise, property, dominion and possession of the said agricultural lands and lands for raising cattle and horses of the townsite of Tumacácori and stock farm of Calabazas, but rather shall watch and see with the greatest efficacy that they are always protected and maintained in the quiet and peaceable possession to which they are entitled by legitimate right, so that, in this manner, they may freely have the benefit of, enjoy, possess, sell, exchange, barter, donate, transfer, devise, cede and alienate the aforesaid agricultural lands and lands for raising cattle and horses of the four leagues of the townsite of Tumacácori and its stock farm, Calabazas, and other annexed points, at their free arbitrament and election, as absolute owners and proprietors of said possessions, with the understanding also that just as soon as the original titles of said agricultural and grazing lands are obtained they shall be aggregated to the present ones, and the transmittal and delivery of said original documents are considered as made and verified from this moment in favor of said party in interest, Don Francisco Alejandro Aguilar.

In which terms I have issued this title of formal sale, transfer and adjudication to said Mr. Aguilar, his heirs and successors, delivering it to the former for his security and other convenient uses, after entry thereof in the proper place.

Given in the port and village of San Fernando de Guaymas, on the nineteenth day of the month of April, eighteen hundred and forty-four, authenticated and signed by me, the Treasurer of the Department, sealed with the

authority, or that the exercise of power, if unwarranted, was subsequently lawfully ratified; and the same rule applies to this court on appeal. *Hayes* v. *United States*, 170 U. S. 637; *Ely's Administrator* v. *United States, ante,* 220.

The titulo shows that Ignacio Lopez, treasurer of the department of Sonora, assumed to make the sale and grant of the lands in question, in the exercise of sole authority, *ex officio,* under the decree of February 10, 1842, and article 73 of the law of April 17, 1837, as being property "pertaining to the department of temporalities," the value whereof did not exceed five hundred dollars. He asserted the power to determine, alone, that the lands were of the temporalities; that their value was not over five hundred dollars; and to sell and grant them independently of other officials than himself.

The Court of Private Land Claims held that if the lands belonged to the class of temporalities it was clear that the treasurer of the department had no power to make a sale by his sole authority, whether the value exceeded five hundred dollars or not; and if the lands did not belong to that class, nevertheless there was the same want of power under the laws of Mexico in relation to the disposition of the public domain.

Many of the laws in this regard have been set forth in *United States* v. *Coe,* 170 U. S. 681; *Hayes* v. *United States, supra; Ely's Administrator* v. *United States, supra;* and other cases, and the statement of so much thereof as particularly bears on the matter in hand involves some repetition.

By the law of January 26, 1831, a general department of revenues was established, under whose control all branches of the treasury were placed, except the general administration of the mail and of the mint. A general director and three auditors were provided for, to be appointed by the government, and the general department was divided into three sec-

---

seal which this Treasury uses, before my undersigned attendant witnesses, in the absence of a Notary of the Treasury or a Notary Public, there being none, according to law.

                                        IGNACIO LOPEZ.

Witness: JOSE DIEGO LABANDERA.
Witness: JOSE MARIA MENDOZA.

tions, of each of which an auditor was the chief. 2 Dublan and Lozano Mex. Laws, 308.

May 21, 1831, a law was passed creating commissaries general and commissariats, and on July 7, 1831, regulations were issued under the law of January 26. The first auditor was made chief of the first section, having charge, among other things, of "national property in which is included, under article nine of the law of August 4, 1824, that of the inquisition and temporalities, and all other country or town property belonging to the Federation." 2 Mex. Laws, 329, 341.

The tenth regulation provided that the general department should take an exact account of the number, location, value, condition and present method of administration of all the property and estates of the nation, in which were included those of the inquisition and temporalities, and all others that belong to the public exchequer, in accordance with the law of August 4, 1824; should see to the thorough collection of the proceeds, as provided in the law of January 26 and other laws; and should do whatever it considered most beneficial in regard to the sale, lease or other means of administration that might be advisable, in whole or in part, of the property in question.

Certain regulations were thereafter prescribed, and set forth in a circular of July 20, 1831, 2 Mex. Laws, 351, whereby the commissariats general were located in the capitals of certain enumerated states; and, at designated points in others, that of Sonora being at Arizpe; but the commissaries, if they thought a change would be advantageous, were required to bring it to the notice of the government with their reasons.

Articles 126 and 127 of these regulations read:

"126. All purchases, sales and contracts made on account of the treasury, whatever be their purpose, shall be made by the commissaries general sitting as boards of sale; but before convoking them, it shall be absolutely necessary to receive first the order therefor, either from the supreme government, communicated directly or through the treasury general, or rather from the directory of revenues, when it relates to matters subject thereto.

"127. Said board shall hold its sessions in the room most suitable for the purpose in the commissariats, or in the public place nearest to those offices, and the regular members shall be the commissary or sub-commissary; who shall preside, the senior officer of the treasury, or the one who acts in his stead, and the attorney general, where there is one, and each of these employés shall take the place or seat to which he is entitled in the order in which they are named."

Besides the regular members, it was provided by Article 128 that there should be special members, depending on the character of the sale, purchase or contract being made, as for instance, when it related to the offices or revenues in the federal district subject to the directory general, the auditor in charge should attend; and if subject to any of the other departments, the chief clerk of the bureau of accounts, etc. If it related to supplies for army service, the officer appointed by the proper inspector should be present; if to business pertaining to the artillery arsenals, etc., the chief officer thereof; if to hospital service, the first assistant of the medical corps; if to fortification works, the chief of the corps of engineers; and if, finally, to other matters, the employé of the nearest related department appointed by the commissary general. Timely notice was required to be given to the regular and special members of the day and hour of the sale, which ordinarily should be held at ten o'clock in the morning.

It was also provided that if there was a notary public in the place, he should necessarily be present at the sessions of the board, and that whatever was done therein should be certified to by him, or by two attending witnesses, if there was none; that the sales or purchases intended to be made should be published for at least eight days beforehand by placards put up in the most public and frequented places, and also inserted in newspapers of greatest circulation, if there were any, care being taken that the notices contained the necessary information about the matter and its most essential circumstances; that when the sale was opened, and the customary proclamations made, all lawfully made bids should be received

until the day of final sale, which should be made "to the bidder who offers the most advantages to the treasury, as determined by an absolute majority of the votes of the board, which minute and everything that may have occurred at the sale shall be entered on the book, which the commissary and sub-commissaries shall keep for the purpose, and which the members shall sign with attending witnesses or with the notary, who, besides, shall draw up all other necessary papers. In the absence of a notary, a clerk, whom the commissary shall bring for the purpose, shall draw up the minutes and the conclusions." The proceedings were then to be forwarded with a report thereon to the supreme government, " without whose approval the purchase, sale or contract shall not be carried into effect; " and it was also provided that " when there is evidence that any member of the board has bought or sold at the sale, himself or through a third person, the sale shall be void and he shall be punished with the penalties the laws impose upon those who commit like abuses."

In 1835 the state legislatures were abolished and departmental bodies established; and the bases for a new constitution were adopted, followed by such constitution dividing the country into departments, the interior government of which was entrusted to the governors in subordination to the general government. 3 Mex. Laws, 75, 89, 230, 258.

By a decree of April 17, 1837, the principal officer of the general treasury in each department was designated as the superior chief of the treasury, and on him and his subordinates was conferred by article 92 the powers and duties formerly exercised by the commissary general and sub-commissaries, " in so far as they do not conflict with this decree, for in that respect all existing laws stand repealed." 3 Mex. Laws, 363.

Articles 73, 74, 75 and 76 were as follows:

" 73. All the purchases and sales that are offered on account of the treasury and exceed five hundred dollars, shall be made necessarily by the board of sales, which, in the capital of each department, shall be composed of the su-

perior chief of the treasury, the departmental treasurer, the first alcalde, the attorney general of the treasury, and the auditor of the treasury, who shall act as secretary. Its minutes shall be spread on a book which shall be kept for the purpose, and shall be signed by all the members of the board, and a copy thereof shall be transmitted to the superior chief of the treasury, for such purposes as may be necessary and to enable him to make a report to the supreme government.

" 74. The superior chiefs shall hold meetings of the boards of the treasury at least twice a month, and when they consider it necessary according to the difficulty and importance of the business. These boards shall be composed of said chief, the departmental treasurer, the attorney general of the treasury, the principal collector of the revenues and the auditor of the treasury, who shall act as secretary thereof.

" 75. The object of the board of the treasury shall be to procure the prosperity and increase of the revenues of the treasury, the most easy and prompt collection thereof, to promote the economies that should be made, to expedite such grave matters of difficult solution as the superior chief may bring to its knowledge and to make a report to the latter of bad management, improper conduct, failure to comply with their duties and other omissions of which they may have knowledge, or may have observed in the employés of the treasury of the department.

" 76. The minutes of the board shall be spread on the proper book, which shall be signed by all the members thereof, and an authenticated copy transmitted to the superior chief of the treasury to enable him to make a report to the supreme government, when the case requires it."

By a law of December 7, 1837, it was made the duty of the governors, among other things, " to preside over the boards of sale and of the treasury, with power to defer the resolutions of these latter until, in the first or second session thereafter, the matter under consideration is more carefully examined into." 3 Mex. Laws, 443.

By Article 140 of a decree of June 13, 1843, it was made the

duty of the governor of each department to publish the decrees of the president and cause them to be complied with; and by subdivision 10 of Article 142, the governor was made the chief of the public treasury of the department with general supervision of the same. 4 Mex. Laws, 428. And in passing it may be remarked that there is absolutely nothing in this record to indicate that the governor participated in any way in the act of sale, while the terms of the testimonio clearly show that the departmental treasurer proceeded and assumed to proceed upon his own sole authority.

December 16, 1841, the office of the superior chief of the treasury created by the decree of April 17, 1837, was abolished, and it was provided that the departmental treasurers should continue for the present to perform the functions of their office as established by the law creating them, and also to perform those of the discontinued chiefs of the treasury, except such as were assigned to the commandants general, who were to be inspectors and visitors of the treasury offices, and to see that the public revenues were well and faithfully collected, administered and disbursed; and to make timely reports to the supreme government of what they observed, which should be brought to its attention. 4 Mex. Laws, 75.

On February 10, 1842, the following decree was issued:

"Antonio Lopez de Santa Ana, etc.

"Article 1. The boards of sale in the several departments will proceed to sell, at public auction, to the highest bidder, the properties (fincas) situated therein that pertain to the department of temporalities.

"2. No bid will be admitted that does not cover the amount considered to be the value of the property (fincas), computed from the amount of the leases, which shall be considered as the interest thereof, at the rate of five per cent.

"3. The bids shall be made for cash, which shall be paid when the sale is approved, less the amount of the burden imposed on each property (fincas), which the buyers shall continue to recognize with a mortgage thereof.

"4. No action or claim, which the actual lessors of the property (fincas), in question, may intend to set up for im-

provements or under other pretext shall, in any manner, embarrass the proceedings of the board of sale in making the sales, but the right of parties in interest to apply to the supreme government, or to the proper authorities, shall remain intact.

"Therefore I order this to be printed, published and circulated, and demand that it be complied with." 4 Mex. Laws, 114.

Lopez certified that it was in virtue of this decree that he had sold the lands in question as belonging to the class of temporalities, and as being of a value not exceeding five hundred dollars, in which case he assumed that he was authorized to sell irrespective of the board of sales in view of Article 73 of the decree of April 17, 1837. The argument is that as that article provided that all purchases and sales exceeding five hundred dollars should be made necessarily by the board of sales, therefore all property under that value could be sold by the departmental treasurer alone; but the difficulty is, as pointed out by the Court of Private Land Claims, that even if that provision operated in the manner contended for, it had no application to a sale under the decree of February 10, 1842, which specifically directed that the sales should be made by the board, and contained nothing to suggest that the value of the property affected the power and duty of the board in any way.

The decree recognized the existence of the boards of sale as the only proper official organs to accomplish the results desired, and it was this decree that was relied on as justifying the proceedings. If these lands were not of the temporalities, then the basis of the sale utterly failed, as the decree applied only to property of that class, and if of the temporalities the sales were to be made by the board.

In relation to Article 73 of the law of 1837, some further observations may be added.

The regulations of July 20, 1831, and the law of April 17, 1837, treated of the same subject-matter, and must be read together; and prior laws, so far as not conflicting, were expressly saved from repeal by Article 92 of the latter act.

By section 73, the board of sales was necessarily to make sales exceeding five hundred dollars, but nothing was said as to sales for less than that sum. This would seem to have left the law of 1831 in force in respect of the making and the conduct of sales of property having a value below that amount, and whether the board of sales consisted of the membership prescribed by section 73, or was composed in some respects of a different membership, is not material. While these various laws are rather confusing in their number and minuteness, nothing is clearer than that the power to make sales and grants was vested in the treasury department of the nation and governed by strict rules and regulations, none of which contemplated that any single officer could make the sales. It is enough that the departmental treasurer did not possess the power, acting singly and on his own responsibility, to conclusively determine to what class lands belonged, and their value, and having decided these points, thereupon to exercise the sole power of sale.

Tumacácori, Calabazas and Huebabi are said to have been originally separate and distinct pueblos and missions, of which the two latter were abandoned as early as December, 1806, when the native Indians of Tumacácori and the governor of said Indians presented petitions to the governor and intendente Conde to give them title in accordance with the royal instructions of October 15, 1754, and of Article 81 of the royal ordinances of December 4, 1786, (alleging the loss or destruction of their old title papers,) of the lands embraced in the *fundo legal* and the *estancia* of each pueblo and mission, whereupon the grant of 1807 was made.

The titulo refers to some lands acquired by purchase, though the record leaves that matter entirely vague and uncertain, and declares the grant to be made to the pueblo and natives of Tumacácori, that they may " enjoy the use and freely possess at will and for their own benefit in community and individually, and for the decent support of the church of said mission, but under the condition that in no case and in no manner shall they alienate at any time any part of said lands which are adjudicated and assigned to them, since they are

all to be considered as belonging to the Republic and community of natives alone, for their proper use, as well for sowing purposes as for stockraising and the increased prosperity of the same."

This was in accordance with the general rule that the missionaries and Indians only acquired a usufruct or occupancy at the will of the sovereign. *United States* v. *Cervantes*, 18 How. 553.

Prior to 1829, the tribunal of the inquisition had been abolished by the Cortes, and the monastic and other religious orders suppressed, and on the 10th of May of that year it was ordered, through the department of the treasury, that "the property in which consist the funds of the temporalities of the ex-jesuits, and monastics, and the rural and urban estates belonging to the inquisition" be sold at public sale to the best and highest bidder. (2 Mex. Laws, 108.) May 31, 1829, the commissary general of Mexico published a "list of the urban and rural estates relating to the temporalities of the ex-jesuits and suppressed monastics, with a statement of their values, the burdens they carry, and annual revenue," (Ib. 117,) which did not include the lands in question. The departmental treasurer did not claim, and manifestly did not acquire, the power to sell these lands under the order of May 10, 1829, or the regulations of July 7, 1831, bearing on that subject.

By a decree of April 16, 1834, (2 Mex. Laws, 689,) the missions of the Republic were secularized, that is to say, converted from sacred to secular uses, and so far as these lands could have been regarded as temporalities, that is, profane property belonging to the church or its ecclesiastics, that decree changed their condition.

And, as many years before the sale in question, the lands of this pueblo and mission were abandoned, it would seem that they thus became part of the public domain of the nation, and that as such the only laws applicable to their disposal were the laws of the nation in relation to its vacant public lands, to which the proceedings in this instance do not purport to have conformed or to have been made under them.

We concur with the Court of Private Land Claims that in

either view there was a fatal want of power in the departmental treasurer to make the sale, and it is not asserted in the petition, nor was any evidence introduced to show that his action was participated in or ratified by the governor, or by the national government in any manner. And this is not a case in which the sale and grant can be treated as validated by presumption.

*Decree affirmed.*