WATTS et al. v. ELY REAL ESTATE INV. CO.

(District Court, D. Arizona. January 2, 1919.)

No. E-55.

1. PUBLIC LANDS ⬡198—MEXICAN GRANTS—CONSTRUCTION OF TREATY.

The provision of the treaty of Guadalupe Hidalgo of 1848 (9 Stat. 922) relating to Spanish and Mexican land grants did not operate to reserve any lands within the Gadsden Purchase, all of which remained subject to disposal by Congress until claims for such grants were presented, located, and approved.

2. PUBLIC LANDS ⬡220—DECREE OF COURT OF PRIVATE LAND CLAIMS—MATTERS CONCLUDED.

Under Act March 3, 1891, c. 539, 26 Stat. 854, creating the Court of Private Land Claims, a decree of that court in a suit between the United States and a claimant under a Mexican grant could not affect the title of a prior grantee, who was not a party to the suit.

3. PUBLIC LANDS ⬡223(3)—CONFLICTING GRANTS—PRIORITY.

A grant by Congress of lands in New Mexico, to be selected by the grantee, and which were so selected, and the selection approved by the Surveyor General and confirmed by the Land Department, cannot be displaced as to any of the lands by a Mexican grant, claim to which was not made until long afterward.

4. LIMITATION OF ACTIONS ⬡44(1)—ACCRUAL OF RIGHT OF ACTION—ACTION TO RECOVER GRANTED LANDS.

Where a survey of a large grant of public lands was necessary to segregate the lands granted, limitation does not begin to run against

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

an action for their recovery by the grantee until such survey is made and approved.

5. DEEDS ⬦⟹114(1)—LANDS CONVEYED—SUFFICIENCY OF DESCRIPTION.
    Description in deeds *held* sufficient to include land in controversy.

In Equity. Suit by Cornelius C. Watts and Dabney C. T. Davis, Jr., against the Ely Real Estate Investment Company. Decree for complainants.

Kingan & Campbell, of Tuscon, Ariz., for plaintiffs.
Selim M. Franklin, of Tuscon, Ariz., for defendant.

SAWTELLE, District Judge. This is an action brought by Cornelius C. Watts and Dabney C. T. Davis, Jr., against the Ely Real Estate Investment Company, to quiet title to a tract of land containing approximately 2,000 acres, located in Santa Cruz county, Ariz. Plaintiffs are citizens of the state of West Virginia, and the defendant is a corporation organized and existing under the laws of the state of Missouri.

The bill alleges that by an Act of Congress of June 21, 1860 (12 Stat. 71, c. 167) authority was given the heirs of Luis Maria Baca to select approximately 500,000 acres of vacant land, not mineral, in the then territory of New Mexico, to be located by them in square bodies not exceeding five in number; that—

"on June 17, 1863, pursuant to the provisions of said act, the said heirs selected and located as the third of said bodies a tract of land, then situated in the said territory of New Mexico, and now in the county of Santa Cruz, state of Arizona, described as follows, to wit: 'Commencing at a point one mile and a half from the base of the Salero Mountain in a direction north 45 degrees east of the highest point of said mountain, running thence from said beginning point west 12 miles, 36 chains, and 44 links; thence south 12 miles, 36 chains, and 44 links; thence east 12 miles, 36 chains, and 44 links; and thence north 12 miles, 36 chains, and 44 links, to the place of beginning.' On April 9, 1864, said selection and location were approved by the Commissioner of the General Land Office, and a survey ordered, which survey was thereafter made, approved, and filed in the office of the Commissioner of the General Land Office, and in the offices of the register and receiver of the land office in Arizona. The plaintiffs, by mesne conveyances, acquired the title in fee simple to the whole of the south half of said land, and became and are now the owners thereof in fee simple, and entitled to the possession thereof."

The defendant makes some claim adverse to the plaintiffs to said land or some part thereof.

The defendant filed its answer, alleging therein, amongst other things, that the defendant—

"is the owner in fee simple of all that certain tract and parcel of land situate in the county of Santa Cruz, state of Arizona, known and called the Rancho San Jose de Sonoita, being a confirmed Mexican land grant, * * * a portion of which grant is within the limits of the tract of land mentioned, described, and claimed by plaintiffs in their bill of complaint, the said portion of said Mexican grant, so included within the limits of the said lands claimed by plaintiffs and described in their bill of complaint, being described and platted in that certain survey which plaintiffs allege was made of the said tract described in the complaint, and approved, and filed in the office of the Commissioner of the General Land Office and in the office of the register

and receiver of the land office in Arizona; that this defendant does not have or make and never has had or made, any claim adversely to the plaintiffs to the lands described in the complaint herein, except that part or portion thereof which is within the limits and a part of the said Rancho San Jose de Sonoita aforesaid; '* * * that defendant does claim to be the owner in fee, and avers that it is the owner in fee simple, and does claim adversely to plaintiffs, all that part or portion of the tract of land described in plaintiffs' complaint, which is within the limits and boundaries of the confirmed Mexican land grant aforesaid, and does allege that plaintiffs have not, nor has either of them, any right, title, or interest in or to any part thereof. Defendant further avers that the plaintiffs, and each of them, are barred and estopped to litigate the matters and things set forth and complained of in their said bill of complaint, in so far as the same affects the title of this defendant in and to that portion of the lands described in said complaint, which are within the limits and boundaries, and are a part of the said Rancho San Jose de Sonoita, the confirmed Mexican grant aforesaid."

The defendant further alleges, in substance: That during the year 1892 the United States of America did file in the United States Court of Private Land Claims its bill against Santiago Ainsa, as administrator of the estate of Frank Ely, deceased, and others, as defendants, wherein the United States, by its attorney, alleged, amongst other things, that the said Ainsa, as such administrator, claimed to be the owner through mesne conveyances to that certain tract of land situate in the then territory of Arizona, known and called the "Rancho San Jose Sonoita" by virtue of a grant made by the officers of the republic of Mexico, when said lands were a part of said republic, and afterwards ceded to the United States by what was known as the "Gadsden Purchase"; that said grant was void—and did pray for a decree of said court that the title to said grant be adjudicated and further be decreed to be invalid and void. That said Ainsa, as such administrator, did file his answer to the said bill, wherein, amongst other things, he did aver that as such administrator he was the owner in fee of the said tract of land known as the San Jose de Sonoita grant, and that he deraigned his title from the grantees of the republic of Mexico, and that the said republic of Mexico did on or about May 15, 1825, sell and grant the said tract of land to one Leon Herreras; that the title or grant was a complete and perfect title and grant—and did pray for a decree of said court adjudging his title to the said lands to be a complete and perfect title in fee, and that he be adjudged to be the owner thereof. That on August 6, 1902, the said Court of Private Land Claims rendered its judgment and decree in favor of the said Ainsa, as administrator as aforesaid, and against the United States of America, wherein said court did adjudge and decree that the said grant, called "Rancho San Jose de Sonoita," and in said decree described, constituted a valid title, and that the said title was perfect and complete at the date of the acquisition of the territory by the United States, and did further decree the confirmation of the title to said grant to the said Herreras, and his heirs, successors and assigns. That the said judgment and decree at all times since has been, and now is, in full force and effect. That the said plaintiffs herein deraigned their title from the United States of America, and therefore are barred and forever estopped, by the said judgment and decree of the said Court

of Private Land Claims aforesaid, from claiming any of the lands within the limits of said San Jose de Sonoita grant to be, or to have been, the lands of the United States, or to be, or to have been, subject to sale, gift, or disposal by the United States. That for more than ten years prior to the commencement of this action defendant and its grantors were, and the defendant now is, in the peaceable and adverse possession of all of the said confirmed Mexican land grant aforesaid, cultivating and using the same and paying taxes thereon, and claiming title under deeds duly recorded. That plaintiffs' cause of action against the defendant as to all of the lands within the limits of said confirmed Mexican land grant aforesaid, which are within the limits of the tract of land claimed by plaintiffs, and described in their bill of complaint, is barred by the provisions of sections 695, 696, 697, and 698 of the Revised Statutes of Arizona of 1913.

The lands embraced within the Baca grant have been the source of much litigation, and numerous controversies involving the title thereto have occupied the attention of the courts and the Land Department since Congress passed the Act of June 21, 1860, authorizing the Baca heirs to select, instead of the land claimed by them, upon which was situated the town of Las Vegas, New Mexico, an equal quantity of vacant land in the then territory of New Mexico. The history of this grant has become a part of the history of Arizona, and the reported cases, including the cases of Ely's Administrator v. United States, 171 U. S. 220, 18 Sup. Ct. 840, 43 L. Ed. 142, Faxon v. United States, 171 U. S. 244, 18 Sup. Ct. 849, 43 L. Ed. 151, Lane v. Watts, 234 U. S. 539, 34 Sup. Ct. 965, 58 L. Ed. 1440, and Wise v. Watts and Davis, 239 Fed. 207, 152 C. C. A. 195, furnish interesting reading.

Five questions are presented by the record in this case:

First. Whether the judgment of the Court of Private Land Claims, in the case of United States v. Ainsa, Administrator, is res adjudicata as between the United States and plaintiffs, its grantees, on the one hand, and Ainsa, administrator, and defendant, his grantee, on the other hand, and whether plaintiffs are estopped by said judgment from litigating the question of title to that portion of said tract of land located within said Sonoita grant.

Second. Whether the lands selected by the Baca heirs were, at the time of selection, vacant lands of the United States, or whether that portion thereof within the limits of the said Sonoita grant was private property.

Third. Whether the Contzen survey and field notes show upon their face that the lands within the limits of said Sonoita grant, as confirmed, are excluded from the limits of the lands described in the complaint herein.

Fourth. Whether plaintiffs' cause of action against defendant is barred by the statute of limitations.

Fifth. Whether plaintiffs have title to, or interest in, any of the lands described in the complaint herein.

[1] 1. It is my opinion that the judgment of the Court of Private Land Claims in the case of United States v. Ainsa, Administrator, is not res adjudicata as between plaintiffs and defendant, and that plain-

254 F.—55

tiffs are not estopped by said judgment from litigating the question of title to the lands here involved. At the time said cause was initiated in the Court of Private Land Claims, neither the United States nor the said Ainsa, administrator, or his grantee, had any title or valid claim to the said lands.

The San Jose de Sonoita grant was made by the Mexican government to one Leon Herreras in the year 1824, and is within the limits of the Gadsden Purchase, which was acquired by the United States under the terms of the treaty of Guadalupe Hidalgo of 1848. The defendant herein deraigns title under said Herreras and the Mexican government. It is claimed that under the terms of said treaty and the provisions of the act of July 22, 1854, the lands embraced within said Sonoita grant were reserved from entry and sale. In the case of Lockhart v. Johnson, 181 U. S. 516, 21 Sup. Ct. 665, 45 L. Ed. 979, the Supreme Court said that the mere fact of a claimed Mexican grant did not reserve the lands covered by it.

"It was only after their presentation to the Surveyor General of New Mexico for his report thereon that the lands were reserved 'until the final action of Congress.' There was no reservation except by this statute and it related only to lands covered by a claim presented to the Surveyor General. There is no language in the treaties which implies a reservation." Lane v. Watts, 235 U. S. 22, 35 Sup. Ct. 5, 59 L. Ed. 104.

There being no language in the treaty which implied a reservation, Congress had the right to dispose of the lands as it saw fit, and in my opinion the Act of June 21, 1860, "effected a repeal pro tanto of the reservation of the act of 1854." In pursuance of the Act of June 21, 1860, the Baca heirs, on the 17th day of June, 1863, selected a tract of land containing 100,000 acres, of which the Sonoita grant is a part.

"A petition for confirmation of the San Jose de Sonoita grant was not presented to the Surveyor General until December, 1879. It will be seen, therefore, that there was no disclosure of these claims until after the selection of the Baca grant and its location by the Land Department, the consummation of which was accomplished by the approval of the location April 9, 1864." Lane v. Watts, supra.

"The title having passed by the location of the grant and the approval of it, the title could not be subsequently divested by the officers of the Land Department." Wise v. Watts and Davis, 239 Fed. 207, 212, 152 C. C. A. 195, 200.

Neither could the title be divested by the proceeding in the Court of Private Land Claims, to which proceedings the owners of the lands were not made parties.

"The title to the lands involved passed to the heirs of Baca by the location of the float and its approval by the officers of the Land Department and order for survey in 1864, in pursuance of the Act of June 21, 1860." Lane v. Watts, supra.

[2] A careful examination of the Act of March 3, 1891, c. 539, 26 Stat. 854, creating the Court of Private Land Claims, discloses that that court was authorized to determine the validity of titles and the right of claimants to lands which had not theretofore been sold or granted by the United States to other persons; and the title to the lands in controversy having, as we have seen, passed to the heirs of Baca on April 9, 1864, the judgment of that court could not effect or

invalidate the same.    Said Act of March 3, 1891, contains the following provisions:

Section 13, subd. 6: "No confirmation of or decree concerning any claim under this act shall in any manner operate or have effect against the United States otherwise than as a release by the United States of its right and title to the land confirmed, nor shall it operate to make the United States in any manner liable in respect of any such grants, claims, or lands, or their disposition, otherwise than as is in this act provided."

Section 8: "That any person or corporation claiming lands in any of the states or territories mentioned in this act under a title derived from the Spanish or Mexican government that was complete and perfect at the date when the United States acquired sovereignty therein, shall have the right (but shall not be bound) to apply to said court in the manner in this act provided for other cases for confirmation of such title; and on such application said court shall proceed to hear, try and determine the validity of the same and the right of the claimant thereto, its extent, location and boundaries, in the same manner and with the same powers as in other cases in this act mentioned.

"If in any such case, a title so claimed to be perfect shall be established and confirmed, such confirmation shall be for so much land only as such perfect title shall be found to cover, always excepting any part of such land that shall have been disposed of by the United States, and always subject to and not to affect any conflicting private interest, rights or claims held or claimed adversely to any such claim or title, or adversely to the holder of any such claim or title. And no confirmation of claims or titles in this section mentioned shall have any effect other or further than as a release of all claim of title by the United States; and no private right of any person as between himself and other claimants or persons, in respect of any such lands, shall be in any manner affected thereby."

Section 14: "That if in any case it shall appear that the lands or any part thereof decreed to any claimant under the provisions of this act shall have been sold or granted by the United States to any other person, such title from the United States to such other person shall remain valid, notwithstanding such decree, and upon proof being made to the satisfaction of said court of such sale or grant, and the value of the lands so sold or granted, such court shall render judgment in favor of such claimant against the United States for the reasonable value of said lands so sold or granted, exclusive of betterments, not exceeding one dollar and twenty-five cents per acre for such lands; and such judgment, when found, shall be a charge on the Treasury of the United States. *    *    * "

[3] 2, 3. As above stated, no claim was presented to the Sonoita grant until 1879, and when Congress passed the Act of June 21, 1860, authorizing the Baca heirs to make selection of certain lands, it had a right to assume, as did also the Baca heirs when they located the same, and the Surveyor General when he reported said location, and the Commissioner of the General Land Office when he approved the same on April 9, 1864, that the lands were vacant lands of the United States and subject to selection and location under said Act of June 21, 1860. It was made the duty of the Surveyor General of New Mexico to pass upon the character of the lands and to determine whether they were vacant and nonmineral. He did determine that these lands were vacant and nonmineral, and his report was adopted by the Commissioner of the General Land Office on April 9, 1864, at which time, as we have seen, the title passed. This finding of the Surveyor General and of the Land Department was and is conclusive. Lane v. Watts, 234 U. S. 525, 540, 34 Sup. Ct. 965, 58 L. Ed. 1440.

The Act of 1860 authorized the Baca heirs to locate a certain quantity of land "in square bodies." It was so located, and the surveyor, upon locating the initial or starting point, evidently encountered little difficulty in fixing the exterior boundaries of the lands so selected and located. Having located the initial point, it was incumbent upon such surveyor to survey the outboundaries thereof in accordance with the description contained in the location of 1863.

I attach no importance whatever to the action of Mr. Contzen, the engineer who made the survey, in indicating on his map and survey of Baca float No. 3 the location of the two Mexican grants, Tumacacori and Calabazas, and San Jose de Sonoita. It is true that he was instructed by the Land Department to survey these two grants, but such instructions on the part of the Land Department were without authority of law, and could not affect or invalidate the title which became vested in the Baca heirs in 1864. Besides, in the case of Faxon v. United States, 171 U. S. 244, 18 Sup. Ct. 849, 43 L. Ed. 151, the Tumacacori and Calabazas claim was, by the Supreme Court, held to be void, and the claim of the San Jose de Sonoita grant was never presented to the Land Department until long after the title to the lands embraced therein became vested in the Baca heirs.

[4] 4. A further defense asserted is that of the statute of limitations. A complete answer to this contention is that a survey was necessary to segregate the lands from the public domain; that this survey was not made until 1905, and not filed in and approved by the Land Department until December, 1914; therefore the statute of limitations did not commence to run until the latter date.

[5] 5. The last point made in the case is, to quote counsel, as follows:

"That the plaintiffs are not the owners of the land in controversy, and that is based upon the fact that the deed to Robinson, nor the deeds from Robinson on down, do not convey, either to these plaintiffs, or to their grantors, the land in controversy."

This raises the question as to the sufficiency of the description of the lands contained in each of the several deeds, above referred to, to convey the title to the lands set forth in the complaint herein. A similar objection was made to said deeds in the case of Watts and Davis v. Wise et al. It was there contended that said deeds did not convey the lands described in the 1863 location, but conveyed other and different lands. This court held that said deeds described and conveyed the 1863 location. This ruling was assigned as error on appeal to the Circuit Court of Appeals, and was by that court approved and affirmed; that court holding that the false description of 1866 should be rejected and effect given to the true description of 1863.

I think the deeds admitted in evidence herein convey the specific land here involved. A decree will be entered in accordance with the foregoing.