### WISE et al. v. WATTS et al.

(Circuit Court of Appeals, Ninth Circuit. January 8, 1917. Rehearing Denied February 13, 1917.)

#### No. 2719.

1. DEEDS ⚖➡93—CONSTRUCTION—GENERAL RULES.
    The paramount object in the construction of a deed is to give effect to the intention of the parties which is to be gathered from a consideration of the entire instrument, read in the light of the facts and circumstances under which it was executed.

    [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 231, 232.]

2. DEEDS ⚖➡115—CONSTRUCTION—INTENTION OF PARTIES—PROPERTY CONVEYED.
    By Act June 21, 1860, c. 167, 12 Stat. 71, the heirs of the claimant of a Mexican grant in New Mexico (now in Arizona) were authorized in lieu of a tract claimed by them to select an equal quantity of vacant land in square bodies not exceeding five in number. In 1863 tract No. 3 was selected, described by courses and distances from a named corner, and the selection was approved by the Commissioner of the General Land Office as authorized by the Act in 1864. In 1866, a grantee of the tract claiming that through mistake the description did not embrace the land intended, the Surveyor General was authorized by the Commissioner to change the boundaries, which was done. This change was afterward held without authority and void by the Supreme Court. In 1870, the same grantee executed a deed in which the land was described: (1) By naming the grant and the conveyance to him by the heirs; (2) by the boundaries, which were those given in the void relocation of 1866, but which had not at that time been held invalid; and (3) by stating that the land was

---

⚖➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that known as location No. 3, under the grant. This deed was executed pursuant to and in execution of a contract of sale made before tract No. 3 was located, and while it was still a float. *Held*, that it was the evident intention of the parties that the deed should convey all the grantor's interest in such tract, and that it should be so construed; that the two parts of the description which were in accordance with such intention should be given effect while the description by metes and bounds should be rejected, and the deed held to convey the land in accordance with the original and true boundaries.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 325.]

3. DEEDS ⬥116—CONSTRUCTION—INTENTION OF PARTIES—QUITCLAIM.
    Such deed, while in form one of "remise, release and quitclaim," purported to quitclaim the land, "to have and to hold all and singular the above-described premises * * * unto the party of the second part, his heirs and assigns forever." *Held*, that it was the intention of the parties to convey, not only the then interest of the grantor, but the land itself; that the deed was one of bargain and sale under which a subsequent conveyance to the grantor of then outstanding interests of certain heirs inured by the benefit of his grantee.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 330.]

4. PUBLIC LANDS ⬥205—CONFIRMATION OF MEXICAN GRANT—BENEFICIARIES.
    Land in New Mexico was claimed under two conflicting Mexican grants, the claimants in one case being named in their petition and designated as heirs of Luis Maria Baca, the original grantee. On investigation both claims were sustained as valid, and in consideration of the waiver of their claim to the disputed land "the heirs of Luis Maria Baca who make claim to the same tract of land as is claimed by the town of Las Vegas" were authorized to select other lands, which on confirmation of their selection by the Land Department were granted to them. *Held* that, under the law governing confirmation of foreign grants, such grant was to be construed as in favor of the claimant heirs alone, and that no interest therein passed to other heirs who did not join in the claim.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 638, 650.]

Appeals from the District Court of the United States for the District of Arizona; William H. Sawtille, Judge.

Suit in equity by Cornelius C. Watts and Dabney C. T. Davis, Jr., against Joseph E. Wise, Margaret W. Wise, Lucia J. Wise, James E. Bouldin, Jennie N. Bouldin, David W. Bouldin, Helen Lee Bouldin, and the Santa Cruz Development Company. Decree for complainants and certain of the defendants, and the remaining defendants appeal. Modified.

Samuel L. Kingan, of Tucson, Ariz., and Hartwell P. Heath, of New York City (Herbert Noble, of New York City, of counsel), for plaintiffs.

Selim M. Franklin, of Tucson, Ariz., for defendants Wise.

James W. Vroom and G. H. Brevillier, both of New York City, for defendant Santa Cruz Development Co.

Joseph W. Bailey and Weldon M. Bailey, both of Washington, D. C., and John H. Campbell, of Tucson, Ariz., for defendants Bouldin.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROSS, Circuit Judge. This suit was commenced in the court below on the 23d day of June, 1914, by Cornelius C. Watts and Dabney C T. Davis, Jr., to quiet title to a tract of land containing 99,289.39 acres, situate in what was formerly the territory of New Mexico, but what is now Santa Cruz county in the state of Arizona. The defendants answered, and it was stipulated by and between the respective parties, among other things, "that the pleadings by way of answer of each and every defendant herein, heretofore or hereafter duly served upon the solicitors for the plaintiffs or upon the solicitors for the defendants affected thereby, shall be taken not only as a pleading by way of answer, but also as a cross-bill duly filed, served, controverted and at issue, asking affirmative relief against the plaintiffs and against each and every other defendant in the action," and it was further stipulated "that each and every paper was duly served by each of said parties upon each of the other parties or upon the solicitor or solicitors of such other parties."

The trial resulted in a decree of the court adjudging the title to the land in controversy in the following named parties, and in the proportions stated, that is to say: (1) In the defendant Joseph E. Wise, an undivided $1/38$ interest in the whole tract; (2) in the defendant Margaret W. Wise, an undivided $1/38$ interest in the whole tract; (3) in the complainants Watts and Davis an undivided $18/19$ interest in the south half of the tract; (4) in the defendant Jennie N. Bouldin an undivided $18/38$ interest, in the defendant David W. Bouldin an undivided $18/76$ interest, and in the defendant Helen Lee Bouldin an undivided $18/76$ interest, making a total of $18/19$ interest, in the north half of the tract.

The land is known as "Baca Float No. 3," and the title thereto rests upon the grant made by Congress June 21, 1860, by an act entitled "An act to confirm certain private land claims in the territory of New Mexico" (12 Stats. 71; c. 167), section 6 of which is as follows:

"That it shall be lawful for the heirs of Luis Maria Baca, who make claim to the said tract of land as is claimed by the town of Las Vegas, to select instead of the land claimed by them, an equal quantity of vacant land, not mineral, in the territory of New Mexico, to be located by them in square bodies, not exceeding five in number. And it shall be the duty of the Surveyor General of New Mexico, to make survey and location of the land so selected by said heirs of Baca when thereunto required by them; provided, however, that the right hereby granted * * * shall continue in force [for] three years from the passage of this act, and no longer."

The case shows that on June 17, 1863, one John S. Watts, as attorney for the heirs of Luis Maria Baca, selected the land here in controversy as the third of the 5 tracts of land which were granted by the above-quoted section of the statute, the application therefor being in the words and figures following:

"Santa Fe, New Mexico, June 17, 1863.
"John A. Clark, Surveyor General, Santa Fé, New Mexico: I, John S. Watts, the attorney of the heirs of Don Luis Maria Cabeza de Baca, have this day selected as one of the five locations confirmed to said heirs under the sixth section of the act of Congress approved June 21, 1860, the following

239 F.—14

tract, to wit: Commencing at a point one mile and a half from the base of the Salero Mountain in a direction north forty-five degrees east of the highest point of said mountain, running thence from said beginning point west twelve miles thirty-six chains and forty-four links, thence south twelve miles thirty-six chains and forty-four links, thence east twelve miles thirty-six chains and forty-four links, thence north twelve miles thirty-six chains and forty-four links to the place of beginning, the same being situate in that portion of New Mexico now included by act of Congress approved February 24, 1863 [12 Stat. 664, c. 56] in the Territory of Arizona. Said tract of land is entirely vacant, unclaimed by any one, and is not mineral to my knowledge.

"John S. Watts,
"Attorney for the Heirs of Luis Maria Cabeza de Baca."

The selection so made on behalf of the heirs of Baca was approved by the Surveyor General of New Mexico on June 17, 1863, and on April 9, 1864, the Commissioner of the General Land Office approved that selection and ordered a survey thereof, and directed that the plat and field notes of such survey be returned to the General Land Office and filed therein. Thereafter, and on April 13, 1866, John S. Watts, as attorney for the heirs of Baca, made application to the Surveyor General of New Mexico to be allowed to change the boundaries of Baca Float No. 3 as so selected and approved, in and by the following letter:

"Washington City, April 30, 1866.
"Hon. J. M. Edmunds, Commissioner of Land Office—Sir: You will find by reference to the papers in file in your office, that on the 17th of June, 1863, I filed with the Surveyor General of New Mexico an application for the location of one of the five locations confirmed to the heirs of Luis Maria Cabeza de Baca under the sixth section of the act of Congress approved June 21, 1860. I further state that the existence of war in that part of the territory of Arizona and the hostility of the Indians prevented a personal examination of the locality prior to the location, and not having a clear idea as to the direction of the different points of the compass, when the subsequent examination of the location was being made by Mr. Wrightson, in order to have the location surveyed, it was found that the mistake made would result in leaving out most of the land designed or intended to be included in said location. Mr. Wrightson was killed by the Indians, and no survey has been made because of said mistake in this initial point of location. Under these circumstances I beg leave to ask that the Surveyor General of New Mexico be authorized to change the initial point so as to commence at a point 3 miles west by south from the building known as the Hacienda de Santa Rita, running thence from said beginning point north 12 miles 36 chains and 44 links, thence east 12 miles 36 chains and 44 links, thence south 12 miles 36 chains and 44 links, thence west 12 miles 36 chains and 44 links to the place of beginning. I beg leave further to state that this land which will be embraced in this change of the initial point is of the same character of unsurveyed vacant public land as that which would have been set apart by the location as first solicited, but is not the land intended to have been covered by said location, but the land to be included within the boundaries above designated is the land that was intended to be located and was believed to have been located upon until preparations were made to survey said location. Under this state of the case it is hoped that directions will be given to the Surveyor General to correct the mistake.

"Yours respectfully,                           John S. Watts,
"Attorney for Heirs of Luis Maria Cabeza de Baca."

The commissioner thereupon directed the Surveyor General of New Mexico to permit the change in the location so requested to be made,

and from that time until July 25, 1899, the metes and bounds described in that letter were treated by the claimants and by the Land Office as the proper description by metes and bounds of the Baca Float No. 3, although at no time was any survey thereof made by the United States.

The following diagram illustrates the location of 1863 and the change of location attempted in 1866:

DIAGRAM OF 1863 AND 1866 LOCATIONS.
BACA LOCATION No. 3.

Subsequently, to wit, July 25, 1899, the Land Department held that the amendment attempted in 1866 was in reality a new location; that the Department was without authority to permit such a location after the expiration of the three years limited by the act making the grant, and, accordingly, remitted the claimants, to the original location of 1863. That location was surveyed by Philip Contzen under the direction of the Surveyor General of Arizona, which survey was duly approved and thereafter filed in the General Land Office, as stated by the Supreme Court in the case of Lane v. Watts, hereinafter referred to.

In the view we take of the case it will be unnecessary to make much, if any, further reference to the application made on behalf of the heirs of Baca in 1866 for a change in the boundaries of the tract ap-

plied for on their behalf in 1863, and which application met with the approval of the Commissioner of the General Land Office in 1864, because of the decision of the Supreme Court in the case of Lane v. Watts, 234 U. S. 525, 34 Sup. Ct. 965, 58 L. Ed. 1440, in which case, and in the explanatory opinion in the same case on motion for leave to file an application for a rehearing of it (reported in 235 U. S. 17, 35 Sup. Ct. 3, 59 L. Ed. 104) that court distinctly adjudged that the title to the specific tract applied for by the heirs of Baca in 1863 passed to them when on April 9, 1864, the Commissioner of the General Land Office approved that selection and ordered a survey thereof, the court saying (234 U. S. at page 540, 34 Sup. Ct. 972, 58 L. Ed. 1440):

"The title having passed by the location of the grant and the approval of it, the title could not be subsequently divested by the officers of the Land Department. Ballinger v. United States ex rel. Frost, 216 U. S. 240 [30 Sup. Ct. 338, 54 L. Ed. 464]. In other words, and specifically, the action of the Commissioner in approving the location of the grant cannot be revoked by his successor in office, and an attempt to do so can be enjoined. Noble v. Union River Logging R. Co., 147 U. S. 165 [13 Sup. Ct. 271, 37 L. Ed. 123]; Philadelphia Company v. Stimson, 223 U. S. 605 [32 Sup. Ct. 340, 56 L. Ed. 570]."

In explaining that decision the same court subsequently, in denying leave to file an application for a rehearing, said:

"The opinion is explicit as to the main elements of decision. It decides that the title to the lands involved passed to the heirs of Baca by the location of the float and its approval by the officers of the Land Department and order for survey in 1864 in pursuance of the act of June 21, 1860, c. 167, 12 Stat. 71, 72. * * * A few words of explanation will make certain the extent of our decision. In adjustment of the conflict between the Baca grant and the grant to the town of Las Vegas, the act of 1860 was passed. * * * The land was to be located in square bodies and be 'vacant land, not mineral, in the territory of New Mexico,' and it was made the duty of the Surveyor General of New Mexico to survey and locate the lands when selected by the heirs of Baca. There were no other conditions, and these were fulfilled in 1864."

Again, in speaking of the contention there made that certain Mexican grants called respectively the Tumacacori and Calabazas grant and the San Jose de Sonoita grant, conflicted with the approved selection of the Baca Float No. 3, the Supreme Court further said:

"The Tumacacori and Calabazas grant was not presented to the Surveyor General until June 9, 1864, and his report was not laid before Congress until May 24, 1880. A petition for confirmation of the San Jose de Sonoita grant was not presented to the Surveyor General until December, 1879. It will be seen, therefore, that there was no disclosure of these claims until after the selection of the Baca grant and its location by the Land Department, the consummation of which was accomplished by the approval of the location April 9, 1864."

We think this decision of the Supreme Court leaves no ground for the contention that there was any validity in the subsequent attempted change in the boundaries of the Baca Float No. 3 grant, either on behalf of the grantees or on the part of any official of the Land Department. The title to the specific tract embraced by the location made on behalf of the heirs June 17, 1863, and approved by the Commissioner of the General Land Office April 9, 1864, had passed to the heirs,

and there was therefore no authority in any officer of the Land Department to make or permit to be made any change in the location or boundaries of what had theretofore been Baca Float No. 3. Such being the express decision of the Supreme Court in the case of Lane v. Watts, above cited, it is needless to comment any further upon that question.

In so deciding the court evidently proceeded upon the view that the specific description contained in the application of June 17, 1863, identified the land applied for, and that the approval of that selection by the Commissioner of the General Land Office attached the title granted by Congress to that specific tract, and that no patent was required. In its previous decision of the case of Shaw v. Kellogg, 170 U. S. 341, 18 Sup. Ct. 632, 42 L. Ed. 1050, the court had said:

"In this case the Land Department refused to issue a patent; decided that it had no power to do so, and that the title was complete without one. It would seem strange to hold that the lack of a patent left the question of mineral an open one when there was no authority for the issue of a patent, when it was in fact refused and when the title passed the same as though a patent had issued. There was not at the time of these transactions, and has not since been, any statute specifically authorizing a patent for this land. Section 2447, Rev. Stat. [Comp. St. 1913, § 5097], taken from the act of December 22, 1854, c. 10, 10 Stat. 599 [Comp. St. 1913, § 5097] applies only to the case of a claim to land 'which has heretofore been confirmed by law.' And the same may be said as to the special act of March 3, 1869, c. 152, 15 Stat. 342. Here there had been no claim confirmed to any tract of land, but only the grant of a right to locate. In that respect it was like a land warrant, subject to location anywhere within the specified territory. As to land warrants, however, there is a specific provision for the issue of patents. Rev. Stat. § 2423 [Comp. St. 1913, § 4835]. The Land Department was therefore technically right when it said that the statute did not order the issue of a patent, and that the case was one in which the granting act with the approved survey and location made a full transfer of title. Very likely if a patent had been issued the courts would not have declared it void, but have sustained it as the customary instrument used by government to make a transfer of the legal title. Carter v. Ruddy, 166 U. S. 493 [17 Sup. Ct. 640, 41 L. Ed. 1090]. But as there was no statute in terms authorizing a patent, it was not within the power of the locators to compel the issue of one. No court would by mandamus order such issue in the absence of a specific and direct statute requiring it. So when the department refused to issue one, the locators had no alternative but to accept that which the statute had provided as the means of acquiring and the evidence of title, and that must be treated as having all the efficacy of a patent."

The record shows that subsequent to the passing of the title of the United States to the specific tract covered by the location of June 17, 1863, and confirmed by the Commissioner of the General Land Office April 9, 1864, there was executed to John S. Watts by and on behalf of the parties therein named as grantors, the following deed:

"Know all men by these presents: That we, Luis Baca, Prudencia Baca, Jesus Baca, and Domingo, sons of Luis Maria Baca, residents of Pena Blanca, territory of New Mexico; that we, Josefa Baca y Lucero, wife of Luis de Lao, and Altagracia Baca, wife of Francisco Martine, daughters of Luis Maria Baca, residents of Pena Blanca, New Mexico, in our own proper persons, and we, either in our own person or by our attorney in fact Tomas Baca, to wit: Jesus Baca, Tomas Baca, Encarnacion Baca, wife of Manuel Viscano, Josefa Baca, wife of Demetrio de Lao, Jose Baca, Tomas Baca 2nd, Trinidad Baca, wife of Fernando Delgado, Altagracia Baca, wife of Patricio Silva, children

of Juan Antonio Baca, deceased, son of Luis Maria Baca; we, Francisco Silva, Isabel Silva, wife of Vicente Amijo, Jesus Maria Silva, Benito Silva, Valentine Silva and Manuel Silva, children of Cesaria Baca, deceased, who was a daughter of Juan Antonio Baca, deceased; we Isabel Baca, wife of Jose Decetio Leno, David Baca, Santiago Baca, Maria Baca, wife of Luis Maria Ortiz, and Adeliete Baca, children of Domingo Baca, deceased; son of Juan Antonio Baca; we, Antonio Baca, Felipe Baca, wife of Jose Baca, Jesus Maria Baca, Fernando Baca, Josefa Baca, wife of Jesus Baca, Polonia Baca, wife of Pedro Archleque, and Francisco Baca, children of Jose Baca, deceased, son of Luis Maria Baca; we, Quesciro Baca, Diego Baca, Quadalupe Baca, wife of Jesus Maria Leiva, Romaldo Baca, Martina Baca, and Pauline Baca, children of Miguel Baca, deceased; son of Luis Maria Baca; we, Luis Maria Baca, Alejandro Baca, Juan de Dios Baca, and Martino Baca, children of Matio Baca, deceased, son of Luis Mari Baca, deceased; we Antonio Trujillo, Maria Josefa Trujillo, wife of Cesario Ramirez, Andres Trujillo, Juano Trujillo, children of Guadalupe Baca, daughter of Luis Maria Baca, and wife of Santiago Trujillo; and we, Josefa Lopez, wife of Nicolas Amijo, and daughter of Filiciana Trujillo, deceased, daughter of Guadalupe Baca, deceased, Marto Lopez, son of said Filiciana Trujillo, Altagracia Lopez, wife of Francisco Ramirez, and daughter of said Feliciana Trujillo, Jesus Matio Trujillo, son of Guadalupe Trujillo, deceased, who was the daughter of Guadalupe Baca, deceased; we Josefa Sales, wife of Jose Martini, and daughter of Rosa Baca, deceased, daughter of Luis Maria Baca, Dolores Baca, daughter of Rosa Baca, deceased; we Esperidon Baca, and Refugio Baca, children of Francisco Baca, deceased, son of Rosa Baca; we Josefa Baca y Sanchez, daughter of Luis Maria Baca, and wife of Juan Luis Montoya; we Antonio Garcia, Francisco Garcia, Maria Enes Garcia, Juana Maria Garcia, and Maria de Los Angeles Garcia, children of Juana Baca, deceased daughter of Luis Maria Baca, and wife of Jose Garcia; we, Josefa Baca y Lucero, daughter of Luis Maria Baca, and wife of Luis de Lao; we, Altagracia Baca, daughter of Luis Maria Baca, and wife of Francisco Martini; I, Tomas Cabeza de Baca, owner of the interest and claim of Manuel Baca, son of Luis Maria Baca, to his interest as heir of Luis Maria Baca as appears by deed of conveyance executed the 17th day of June, 1861, and duly recorded in the Record Book of the Register of Deeds for Santa Ana County, Letter D, pages 6–7, and I, Thomas Cabeza de Baca, owner of the interest of Ignacio Baca, only son and heir of Ramon Baca, deceased, son of Luis Maria Baca, as appears by deed of said Ignacio Baca and Maria Guadalupe Hurtado to said Tomas Cabeza de Baca, executed on the 1st day of June, 1861, and duly recorded in Record Book D of Deeds for Santa Ana County, pages 5–6; I, Jesus Maria Cabeza de Baca, owner by purchase of the interest of Jesus Baca y Lucero 1st and the son of Luis Maria Baca, as appears by deed of said Jesus Baca y Lucero, and Maria Rafaela Amijo, his wife, executed the 20th day of August, 1861, and recorded in the Record Book Letter D, page 12–13 of the Register of Deeds for Santa Ana County; and I, Francisco Baca, owner by purchase of the interest of Domingo Baca, son of Luis Maria Baca, for and in consideration of the services of John S. Watts, for many years, in and about the business of said heirs of Luis Maria Baca, as the attorney of said heirs, and for the further consideration of three thousand dollars, paid by the said John S. Watts, to Tomas Cabeza de Baca, our attorney in fact, have bargained, sold and conveyed, and by these presents do bargain, sell and convey to the said John S. Watts, of Santa Fé, New Mexico, and to his heirs and assigns forever, all our right, title and interest and demand in and to the following lands located upon by us as the heirs of Luis Maria Baca, under the 6th section of an act of Congress approved June 21st, 1860, to wit: * * *

"And also Location No. 3. Situate in the territory of Arizona, formerly in Don Ana County, New Mexico, and described as follows, to-wit: Commencing at a point one and one-half miles from the base of the Salero Mountain in a direction north forty-five degrees east of the highest point of said mountain, running thence from said beginning point west twelve miles thirty-six chains and forty-four links; thence south twelve miles, thirty-six chains and forty-

four links; thence east twelve miles, thirty-six chains and forty-four links; thence north twelve miles, thirty-six chains and forty-four links to the place of beginning containing ninety-nine thousand, two hundred and eighty-nine acres and thirty-nine one hundredths acres, more or less.   *   *   *

"To have and to hold the lands aforesaid with all of the appurtenances and privileges to the same belonging to the said John S. Watts, and his heirs for-. ever, in fee simple, and the said heirs of Luis Maria Baca, in person, and by their attorney in fact, Tomas Cabeza de Baca, covenant with the said John S. Watts and his heirs, for themselves and their heirs, as follows, to wit:

"1st. That they are seised in fee of the lands aforesaid and have good right and title to the same.

"2nd. That the said lands are free from incumbrances, and that they have full power to sell and convey the same.

"3rd. That the said John S. Watts and his heirs and assigns shall quietly enjoy said lands forever, free from all claim or demand of the said heirs of Luis Maria Baca, their heirs, executors and administrators.

"4th. That they will defend and protect the title aforesaid against all claim or claims of title arising from or under us as heirs of Luis Maria Baca, or under our heirs and executors and administrators.

"5th. That the said John S. Watts and his heirs and assigns shall forever enjoy the lands aforesaid in as full and ample a manner as the heirs of Luis Maria Baca held and enjoyed the said lands, just before the execution of this conveyance.

"In witness whereof we have hereunto set out hands and seals this 1st day of May, 1864."

On the same day, to wit, May 1, 1864, Quirina Baca, Guadalupe Baca, and Jesus Leyva, her husband, Paulina Baca, Martina C. de Baca, and Romalda Baca, according to the record, executed a deed to John S. Watts conveying all their interest in the same land described in the last-mentioned deed.

January 8, 1870, the grantee in the foregoing deeds, namely, John S. Watts, executed, for valuable considerations, to one Christopher E. Hawley, a deed by which he—

"remised, released and quitclaimed, and by these presents do (es) remise, release and quitclaim unto the said party of the second part, and to his heirs and assigns, forever, all that certain tract, piece or parcel of land lying and being in the Santa Rita Mountains in the territory of Arizona, U. S. A., containing one hundred thousand acres, be the same more or less, granted to the heirs of Luis Maria Cabeza de Baca by the United States and by the said heirs conveyed to the party of the first part by deed dated on the 1st day of May, A. D. 1864, bounded and described as follows: Beginning at a point three miles west by south from the building known as the Hacienda de Santa Rita, running thence north twelve miles thirty-six chains and forty-four links, running thence east twelve miles thirty-six chains and forty-four links, thence south twelve miles thirty-six chains and forty-four links, thence west twelve miles, thirty-six chains and forty-four links, to the point or place of beginning: The said tract of land being known as Location No. 3 of the Baca Series, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof;   and also the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in or to the above-described premises, and every part and parcel thereof, with the appurtenances;   to have and to hold all and singular the above-mentioned and described premises, together with the appurtenances, unto the said party of the second part, his heirs and assigns forever.

"In witness whereof, the said party of the first part has hereunto set his hand and seal the day and year first above written.

                                                "John S. Watts.  [Seal]"

Subsequently, and on May 30, 1871, all of the heirs. of Luis Maria Baca except Antonio (also called in the record Jose Antonio) Baca (if he was an heir) executed to the said John S. Watts, a deed in words and figures as follows:

"All of us for and in consideration of the sum of six thousand and eight hundred dollars, paid by John S. Watts to Tomas Cabeza de Baca, agent and attorney in fact of the heirs of Luis Maria Baca, deceased, have bargained, sold, and conveyed, and do by these presents bargain, sell, and convey to John S. Watts, his heirs and assigns forever, the following described tract of land, situate in the territory of Arizona and bounded as follows"

—giving a description of a tract of land of large acreage not here involved, and which description is therefore here omitted, the deed proceeding as follows:

"To have and to hold the said lands to the said John S. Watts, his heirs and assigns forever, free from all claims of ourselves as heirs of Luis Maria Baca, deceased, and of all persons claiming by, through, or under us, together with all the privileges and appurtenances to the said land belonging, and the said heirs of the said Luis Maria Baca, and the said Tomas Cabeza de Baca as owner and as the attorney in fact of the said heirs of Luis Maria Baca, deceased, now covenant and agree with the said John S. Watts, his heirs and assigns, as follows:

"First. That they are the sole lawful heirs of Luis Maria Baca; that they are seised in fee of said land and have good right and title to the same and authority to sell and dispose of the same; that said land is free from all incumbrances resulting from them.

"Second. That the said John S. Watts, his heirs and assigns, shall quietly enjoy the possession of said land free from all claim or demands of the said heirs of Luis Maria Baca, their heirs, executors, administrators, and assigns.

"Third. That we will defend and protect the title of the said John S. Watts, his heirs and assigns, to the said lands against all claims and demands arising through or under us as heirs of the said Luis Maria Baca, deceased, or under persons claiming to be heirs of Luis Ma. Baca, deceased; and that the said John S. Watts, his heirs and assigns shall have and hold said lands in as full, perfect and ample a manner as the said heirs of Luis Ma. Baca, deceased, had and held said lands just before the execution of said conveyance; and the said heirs of Luis Ma. Baca, above mentioned, now ratify and confirm the title made by us by our attorney, Tomas Cabeza de Baca, to John S. Watts, his heirs and assigns, on the 1st day of May, 1864, for the lands described in Location Number Two, situate on the Canadian river in San Miguel county, New Mexico, and Location Number Four situate in Saguatch county, Colorado Territory, and Location Number Three, situate in Arizona Territory, containing each 99,289 39/100 acres, the boundaries of which are set forth and described in said deed; and, the said heirs of the said Luis Maria Baca, deceased, executing this deed as herein set forth, relinquish and quitclaim to said John S. Watts, his heirs and assigns, all their right, title and interest in all the lands in said deed of May 1st, 1864, mentioned and described."

It is undisputed that Luis Maria Baca had 18 sons and daughters, but a material issue in the case was whether Antonio Baca, under whom Joseph E. Wise and Margaret W. Wise claim title, was also an heir, and whether, if such heir, he was one of the grantees under the act of Congress of June 21, 1860.

The court below found from the evidence that Antonio Baca was a son of Luis Maria Baca, and died before the latter, and that his heirs inherited $^1/_{10}$ of the land in controversy, and that the appellant

Joseph E. Wise and the defendant to the suit Margaret W. Wise (who took no appeal) through various mesne conveyances acquired in equal shares all of the interest of the heirs of Antonio Baca. That question of heirship and right of inheritance from him of any interest in the land in controversy and that finding and decision of the court will be considered further on.

Passing for the present the rights claimed under Antonio Baca, it appears from the record, and is undisputed, that John S. Watts died in 1876, leaving surviving him a widow, two sons, and two daughters, having made no other deed than that to Hawley, purporting to convey any interest in either the 1863 location or the 1866 attempted location of the Baca Float No. 3 grant.

The complainants and appellants Watts and Davis, and the defendants, appellants, and appellees Bouldin, deraign their alleged titles under mesne conveyances from the aforesaid deed to Hawley from John S. Watts of date January 8, 1870, the former to the south half and the latter to the north half of the tract in controversy, to wit, the specifically described tract as located in 1863.

The defendant and appellant Santa Cruz Development Company deraigns its alleged interest, and the defendant and appellant Joseph E. Wise deraigns some alleged interest, under mesne conveyances from the widow and heirs of John S. Watts. Therefore it is clear that if the deeds to Watts of May 1, 1864, conveyed the interest of all of the heirs of Luis Maria Baca in and to the tract specifically located in 1863, or if the confirmatory deed to Watts of May 30, 1871, had that effect and inured to the benefit of Hawley, his heirs and assigns, nothing remained in John S. Watts subsequent to the execution of his deed to Hawley, and therefore his heirs inherited no interest in the property in controversy upon his death, and of course could convey none to any one.

It does not seem to admit of question that such of the heirs of Luis Maria Baca as personally or through a duly authorized representative executed the deeds of May 1, 1864, to John S. Watts, thereby conveyed to him all of their interest in the tract of land in controversy, for in those deeds the land described included Baca Tract No. 3, declared to have been located by the grantors "as the heirs of Luis Maria Baca under the 6th section of an act of Congress approved June 21, 1860," and which tract was also therein described by the exact specific description given in the location thereof made in 1863 and confirmed by the Commissioner of the General Land Office April 8, 1864. The subsequent deed from the grantee in the last-mentioned deeds, John S. Watts, however, to Christopher E. Hawley, remised, released, and quitclaimed to him—

"and to his heirs and assigns, forever, all that certain tract, piece or parcel of land lying and being in the Santa Rita Mountains in the territory of Arizona, U. S. A., containing one hundred thousand acres, be the same more or less, granted to the heirs of Luis Maria Cabeza de Baca by the United States and by the said heirs conveyed to the party of the first part by deed dated on the 1st day of May, A. D. 1864, bounded and described as follows: Beginning at a point three miles west by south from the building known as the Hacienda de Santa Rita, running thence north twelve miles thirty-six chains and forty-

four links, running thence east twelve miles, thirty-six chains and forty-four links, thence south twelve miles, thirty-six chains and forty-four links, thence west twelve miles, thirty-six chains and forty-four links, to the point or place of·beginning: The said tract of land being known as Location No. 3 of the Baca Series, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in or to the above-described premises, and every part and parcel thereof, with the appurtenances; to have and to hold all and singular the above mentioned and described premises, together with the appurtenances,. unto the said party of the second part, his heirs and assigns forever."

It will be at once seen that the specific description in this deed is that of the attempted location of 1866, adjudged void by the Supreme Court in the case of Lane v. Watts, supra, and as to which specifically described tract the grantor had no title except to a narrow strip thereof covered also by the 1863 location of the grant.

It is insisted that the deed last mentioned was a quitclaim deed only,. and that the subsequent confirmatory deed from the heirs of Luis Maria Baca of date May 30, 1871, to John S. Watts, did not inure to the benefit of Hawley, and that all that the latter got by his deed from John S. Watts was the narrow strip of land included in both the approved location of 1863 and the attempted, but void, location of 1866.

[1] It almost goes without saying that the paramount object in the construction of a deed is to give effect to the intention of the parties to it. Authorities to that effect might readily be cited by the hundreds, but it is needless to consume space for that purpose. Such intention, of course, is to be gathered from a consideration of the entire instrument read in the light of the facts and circumstances under which it was executed.

[2] Taking up the deed from Watts to Hawley, the first thing to be noted is that it does not purport to convey more than one tract of land, although it undertakes to apply to it three descriptions. The first and third of those descriptions sufficiently describe the tract of land in controversy, while the second describes it by the metes and bounds given in the void location attempted to be made in 1866. In substance the first describes it as that certain tract of land lying in the Santa Rita Mountains territory of Arizona, granted to the heirs of Luis Maria Cabeza de Baca by the United States and by the said heirs conveyed to the grantor Watts by deed dated May 1, 1864, containing 100,000 acres more or less. The land thus described is not only susceptible of identification by reference to the grant made by Congress to the Baca heirs, but also by the deeds of May 1, 1864, from those heirs to Watts, in which deeds, as has been shown, the land in question was described by reference to the congressional grant, and also by the specific boundaries thereof given in the only valid location of the grant made in 1863 and confirmed by the Commissioner of the General Land Office in 1864. The second description given in the Hawley deed consisted of the metes and bounds given in the attempted and void location of 1866, which, except as to the narrow strip em-

braced by the valid location of 1863, covered a tract of land in which the grantor had no interest. Reading the deed without any reference to the facts and circumstances under which it was executed, it does not seem that there should be any doubt that the false description should be rejected and effect given to the two true descriptions given in the deed of the land undertaken to be conveyed by the grantor. In referring to the maxim "Falsa demonstratio non nocet," it is said, in Broom's Legal Maxims, p. 629, et seq.:

"Falsa demonstratiò may be defined to be an erroneous description of a person or thing in a written instrument; and the above rule respecting it may be thus stated and qualified: As soon as there is an adequate and sufficient definition, with convenient certainty, of what is intended to pass by the particular instrument, a subsequent erroneous addition will not vitiate it. 'Quicquid demonstratæ rei additur satis demonstratæ frustra est.' The characteristic of cases within the principal maxim being that 'the description so far as it is false applies to no object at all, and so far as it is true applies to one only.'"

And, after referring to the application of the maxim by various judges to wills, it is further said:

"The foregoing observations are, in the main, applicable not only to wills, but to other instruments; so that the characteristic of cases strictly within the above rule is this, that the description, so far as it is false, applies to no subject, and, so far as it is true, it applies to one subject only; and the court, in these cases, rejects no words but those which are shown to have no application to any subject."

Looking to the circumstances of the case as disclosed by the record, we find them strongly confirmatory of the view we take of the deed itself. John S. Watts, it appears, was at one time a Justice of the Supreme Court of New Mexico, had represented that territory as a delegate to Congress, and was employed to present the claim of the heirs of Luis Maria Baca to the Las Vegas grant to the United States tribunal for confirmation, and did so, as we shall presently see. As early as March 2, 1863, which was after the making of the grant by Congress of June 21, 1860, but before any location of the grant made by the sixth section of that act, John S. Watts executed to one William Wrightson, of Cincinnati, Ohio, an instrument reciting that he, Watts, was "the owner of one of the unlocated floats containing about one hundred thousand acres of land granted to the heirs of Luis Maria Baca" by the sixth section of the act of Congress of June 21, 1860, and reciting that he, Watts, then had "full power and authority to make the location for said heirs under said act, and cause to be made a title in fee of the same after such proper location and survey," and then proceeded to declare in and by the said instrument as follows:

"Now, therefore, be it further known that I, John S. Watts, have this day sold to William Wrightson, of the city of Cincinnati, state of Ohio, the said unlocated tract with all of its privileges, for and in consideration of the sum of one hundred and ten thousand dollars, the receipt whereof is hereby acknowledged, and I hereby bind myself, my heirs, executors or administrators, to make a full and complete title in fee simple of said land to said William Wrightson, his assigns or legal representatives, whenever thereunto required. And I, the said John S. Watts, hereby authorize and empower the

said W. Wrightson to make the location under the said act in as full and ample manner as the said heirs could do the same."

The record shows that subsequent to the selection on June 17, 1863, of the land in controversy, by John S. Watts, as the third of the tracts granted to the heirs of Luis Maria Baca by Congress, Wrightson, to whom Watts had for a large consideration agreed to convey in advance of its location the float then claimed by him, found upon examination that most of the land intended to be included in the location made by Watts in 1863 had been left out by mistake, which discovery was the basis of the abortive attempt to change the boundaries of the grant initiated in 1866 by Watts through his application to the Commissioner of the General Land Office of date April 30, 1866, the specific description of which latter attempted location was, as has been seen, inserted in the deed from Watts to Hawley, the assignee through various mesne conveyances of the interests of Wrightson. So far as the acts of the respective parties to the Hawley deed are concerned, it is therefore difficult to see what clearer indications could be shown of the intent of both the grantor and grantee of that deed, that it should convey all of the interest of Watts in Baca Tract No. 3, than the descriptions inserted in the deed already set out, and which therefore need not be repeated.

We have examined with care the cases of Prentice v. Northern Pacific Railroad, 154 U. S. 163, 14 Sup. Ct. 997, 38 L. Ed. 947, and Prentice v. Stearns, 113 U. S. 435, 5 Sup. Ct. 547, 28 L. Ed. 1059, so much relied upon by some of the counsel in the case. The deed under consideration in those cases first described the land by metes and bounds, and then added "and being the land set off to the Indian chief Buffalo by the Indian Treaty of September 30, A. D. 1854, and was afterwards disposed of by said Buffalo to said Armstrong and is now recorded with the government documents." The court held that the added words were intended to describe generally what was first described specifically, and, if otherwise sufficient, could not be regarded as an independent description. In other words, a disregard of the specific description would have left the deed without any description by which the land granted could be identified, which is, as has been shown, essentially different from the case here.

But it is further contended that at the time of the execution of the deed from Watts to Hawley the former had not acquired the interests of all of the heirs of Luis Maria Baca other than Antonio, and that that deed was a quitclaim deed only, and therefore that the interests of all of the other heirs of Luis Maria Baca that passed by the confirmatory deed to Watts executed May 30, 1871, did not inure to the benefit of Hawley or his assigns.

[3] We are therefore next to determine the true character of the Hawley deed. It is to be remembered that an ordinary deed of release and quitclaim is a conveyance only of the grantor's right, title, and interest in the land described in the deed, and is not a conveyance, quitclaim, or release of the land itself. A deed of this character, said the Supreme Court in Van Rensselaer v. Kearney et al., 11 How. 297, 322 (13 L. Ed. 703)—

"purports to convey, and is understood to convey, nothing more than the interest or estate of which, the grantor is seised or possessed at the time, and does not operate to pass or bind an interest not then in existence. The bargain between the parties proceeds upon this view, and the consideration is regulated in conformity with it. If otherwise, and the vendee has contracted for a particular estate, or for an estate in fee, he must take the precaution to secure himself by the proper covenants of title. But this principle is applicable to a deed of bargain and sale by release or quitclaim, in the strict and proper sense of that species of conveyance. And therefore, if the deed bears on its face evidence that the grantors intended to convey, and the grantee expected to become invested with, an estate of a particular description or quality, and that the bargain had proceeded upon that footing between the parties, then, although it may not contain any covenants of title in the technical sense of the term, still the legal operation and effect of the instrument will be as binding upon the grantor and those claiming under him, in respect to the estate thus described, as if a formal covenant to that effect had been inserted; at least, so far as to estop them from ever afterwards denying that he was seised of the particular estate at the time of the conveyance."

See, also, note to the case of Mosier v. Carter, 35 L. R. A. (N. S.) 1182, where the foregoing observations are quoted and many other cases to the same effect cited.

Does not the deed from Watts to Hawley bear upon its face evidence that the grantor intended to convey, and the grantee expected to become invested with, the one tract of land therein undertaken to be conveyed? In our opinion, undoubtedly so. It is true that the words "remise, release, and quitclaim" are used in the granting clause, but it is also true that so far from the deed purporting to remise, release, and quitclaim only all the right, title, and interest of the grantor, it plainly manifests, we think, the intent of the grantor to convey, and of the grantee to receive and forever, by himself and his heirs and assigns, hold the property itself. Not purporting to convey only all the right, title, and interest of the grantor, the deed in terms remised, released, and quitclaimed to the party of the second part thereto, and to his heirs and assigns forever, all of that certain tract of land described: First, as the land granted to the heirs of Luis Maria Cabeza de Baca by the United States and by the said heirs conveyed to the party of the first part thereto by a deed dated May 1, 1864; second, according to the courses and distances given in the attempted location of 1866; and, lastly, as the tract of land known as "Location No. 3" of the Baca Float Series, the deed proceeding as follows:

"And also the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part of, in or to the above described premises. * * * To have and to hold all and singular the above mentioned and described premises together with the appurtenances, unto the said party of the second part, his heirs and assigns forever."

In speaking of the difference between a deed in which the grantor only quitclaimed all of his interest in the land described in it and one in the form of a grant, bargain, and sale, the Supreme Court said, in the case of Moelle v. Sherwood, 148 U. S. 21, 29, 13 Sup. Ct. 426, 429 (37 L. Ed. 350):

"If the grantor in either case at the time of the execution of his deed possesses any claim to or interest in the property, it passes to the grantee.

In the one case, that of bargain and sale, he impliedly asserts the possession of a claim to or interest in the property, for it is the property itself which he sells and undertakes to convey. In the other case, that of quitclaim, the grantor affirms nothing as to the ownership, and undertakes only a release of any claim to or interest in the premises which he may possess without asserting the ownership of either."

[4] As has been seen, the deed from Watts to Hawley did not undertake to quitclaim only the interest of the grantor in the land described therein, but, on the contrary, and for the reasons stated, undertook, as we think, to convey the land itself. That being so, that such title as Watts afterwards acquired to the tract in controversy by the confirmatory deed executed to him by all of the heirs of Luis Maria Baca except Antonio (assuming him to have been an heir) inured to the benefit of Hawley and his assigns is clear upon well-settled principles. That confirmatory deed contains, as has been seen, an express covenant that its grantors constitute all of the lawful heirs of Luis Maria Baca, and in terms ratified and confirmed the preceding deeds of May, 1864, purporting to have been executed on behalf of all of such heirs to him, and to have conveyed all of their interest in the land in controversy, and expressly confirming the same to the grantee Watts and his assigns. We are of the opinion that the court below was right in holding that the assignees of Watts thereby acquired the interests of all of the grantors in those deeds. That court, however, found as a fact that Antonio Baca (also called in the record Jose Antonio Baca) was a son of Luis Maria Baca, and that the heirs of Antonio inherited an undivided $1/19$ of the land in controversy, which $1/19$ interest had been acquired through various mesne conveyances by Joseph E. Wise and Margaret W. Wise in equal shares, who still hold the same. Against that finding and conclusion it is strenuously contended that there was no competent proof that Antonio was a son of Luis Maria Baca, and that if there was that neither Antonio nor any of his heirs ever inherited any interest in the land in controversy, and as a consequence that his heirs had no interest therein to convey.

The principal witness introduced to show that Antonio Baca was a son of Luis Maria Baca was Marcos C. de Baca, who was a grantor in one of the deeds executed to Watts May 1, 1864, and he, over the objections of adverse parties to the interests claimed under Antonio, was permitted to testify, among other things, that long subsequent to the execution of the deeds of 1864 and 1871 above referred to, Prudencio, Manuel, and Domingo Baca (who were also grantors in those deeds) had told him that there was a son of Luis Maria Baca named Antonio Baca, who died before his father, and which son left heirs (being the heirs through whom Joseph E. Wise and Margaret W. Wise claim the interests that were awarded to them by the decree below). The grounds of the objections were, in substance, that they were not statements ante litam motam, that they were statements made by grantors after they had parted with their title and in disparagement of the title of their grantees, and that Joseph E. Wise claimed some interest under the Hawley and confirmatory deeds, and is therefore bound by all of the recitals thereof. In the view we take of the grant in question, we do not find it necessary to pass upon the action of the trial

court in overruling the objections, nor upon the sufficiency of the evidence to sustain the finding made by it that Antonio Baca was a son of Luis Maria Baca. We assume that Luis Maria Baca had a son named Antonio Baca, who died before his father. The latter died in 1827, leaving a will, and we find in the proceedings upon his estate, introduced in evidence in the present case, evidence of the fact that there was a son who had died before his father, leaving a widow. The record shows that it was that Antonio Baca under whom the appellees Joseph E. Wise and Margaret W. Wise claim, and were awarded by the judgment of the court below, in equal parts, an undivided $1/19$ interest in the land in controversy. It is important to make that fact plain because of the further fact that Luis Maria Baca left among his 18 surviving children a son named Juan Antonio Baca, as appears from the petition filed by John S. Watts with the Surveyor General of the Territory of New Mexico on behalf of the surviving heirs at law of Luis Maria Cabeza de Baca, deceased, for the confirmation of a Mexican grant called Ojo del Espiritu Sant, in which petition he expressly alleged, among other things, that the said Luis Maria Cabeza de Baca——

"left him surviving, as his heirs, the following children, to wit: Luis Baca, Prudencio Baca, Jesus Baca, Sr., Jesus Baca, Jr., Felipe Baca, Domingo Baca, Manuel Baca, Josefa Baca y Salae, Josefa Baca y Sanchez, Juan Antonio Baca, Jose Baca, Jose Miguel Baca, Ramon Baca, Matia Baca, Guadalupa Baca, Altagracie Baca, Rosa Baca, Juan Paula Baca."

"This statement," said the attorney for the appellees Joseph E. Wise and Margaret W. Wise in his brief, "on the part of John S. Watts as attorney for the heirs, made in 1860, is that the said Luis Maria Baca left 18 children surviving him. As the will of Baca showed that Luis Maria Baca had one son who died before he died, he must have had 19 children, of whom, as stated in the petition of Watts, 18 survived him, and, as stated in the will, one died before he died. The question of fact was then presented upon the trial as to who the nineteenth son was who died before his father, leaving a widow by the name of Francisca Garveso."

The grant made by section 6 of the act of June 21, 1860, had its origin in two conflicting Mexican grants to a large body of land in and around Las Vegas, N. M., one having been made to Luis Maria Baca (also called, as has been said, Luis Maria Cabeza de Baca), and the other to the town of Las Vegas. The history of those grants is given in the cases of Shaw v. Kellogg, 170 U. S. 312, 18 Sup. Ct. 632, 42 L. Ed. 1050, Maese v. Herman, 183 U. S. 572, 22 Sup. Ct. 91, 46 L. Ed. 335, Priest v. Las Vegas, 232 U. S. 604, 34 Sup. Ct. 443, 58 L. Ed. 751, and Lane v. Watts, 234 U. S. 525, 34 Sup. Ct. 965, 58 L. Ed. 1440.

The legislation of Congress for the adjustment of grants of Spanish or Mexican origin in New Mexico was essentially different from that in respect to those of like origin in California; the latter being provided for by the act of Congress of March 3, 1851 (9 Stats. 631, c. 41), and the former by the act of July 22, 1854 (10 Stats. 308, c. 103). No jurisdiction over such claims in New Mexico was conferred upon

the courts; final action in each case after the prescribed action by officers of the Land Department being reserved to Congress. Tameling v. U. S. Freehold, etc., Company, 93 U. S. 644, 30 L. Ed. 949. In exercise of the power so reserved Congress made the grant of June 21, 1860, not only of the lands embraced by section 6 thereof, but various other extensive tracts of land. It is with section 6 only that we have to deal in this case. It has been seen that it embraced the specific tract described in the location made in 1863, and confirmed by the Commissioner of the General Land Office April 9, 1864, and none other. To whom was that grant made? To determine that question the statute and all of the facts and circumstances of the case must be considered. The statute says, as has been seen, "to the heirs of Luis Maria Baca, who make claim to the same tract of land as is claimed by the town of Las Vegas." The record and the history of the grant, as well as the statute itself, show that Congress recognized that both the town of Las Vegas and the heirs of Baca claimed that their respective grants covered that tract, and that, in consideration of the waiver by the Baca heirs of their claim to it, the grant contained in section 6 of the act of June 21, 1860, was made. We insert the petition for the confirmation of the Las Vegas grant:

"Territory of New Mexico, County of Santa Fé.

"To the Hon. Wm. Pelham, Surveyor General of the Territory of New Mexico, under the act of Congress approved 22d June (July), A. D. 1854:

"Your petitioners the surviving heirs at law of one Luis Cabeza de Baca, deceased, would respectfully state that on the 16th day of January, 1821, the Provincial Deputation of the state of Durango granted to the ancestor of your petitioners, Luis Cabeza de Baca, a tract of land called 'Las Vegas Grandes.' * * * Your petitioners further state that it will appear by reference to said grant that it was made to the said Luis Maria Cabeza de Baca and his male children and vested him and his male children with an absolute title to said lands. * * * Your petitioners further state that Luis Maria Cabeza de Baca has long since departed this life, and the only male children of the said Luis Maria Cabeza de Baca now living are the following, to wit: Luis Baca, Prudencio Baca, Jesus Baca the 1st, Felipe Baca, Jesus Baca the 2d, Domingo Baca and Manuel Baca. Your petitioners further state that the following sons of Luis Maria Cabeza de Baca are dead, to wit: Juan Antonio Baca, Jose Baca, Jose Miguel Baca, Ramon Baca, and Mateo Baca, and at the time of their decease they left the following children and heirs at law them surviving, to wit: Juan Antonio Baca left him surviving the following children, Jesus Maria Baca, Francisco Tomas Baca, Incarnacion Baca, Jose Baca, Josefa Baca, Guadalupe Baca, Altagracie Baca, Nicholasa Baca, Tomas Baca & Trinidad Baca. Jose Baca left him surviving the following children: Antonio Baca, Felipe Baca, Jose Maria Baca, Francisco Baca, Fernando Baca & Polonio Baca. Jose Miguel Baca left him surviving the following children, to wit: Diego Baca, Quirina Baca, Rumaldo Baca, Guadalupe Baca, Paulina Baca & Martina Baca. Ramon Baca left him surviving the following child, to wit: Ignacio Baca. Mateo Baca left him surviving the following children, to wit: Luis Baca, Alejandro Baca, Juan Dios Baca and Martin Baca. Your petitioners further state that the foregoing list contains all the surviving heirs of the said Luis Cabeza de Baca, deceased, known to your petitioners, and they are all residents of the territory of New Mexico. * * *

"All of which is respectfully submitted.

"John S. Watts, Atty. for Petitioners."

It will be seen that Antonio Baca was not one of the claimants of the land covered by the Las Vegas grant. And there is nothing in the

record in this case tending to show that John S. Watts ever heard of him, or that any of the other 18 children of Luis Maria Baca ever recognized in Antonio or any of his heirs any interest in either the Las Vegas grant or in the grant made to them by the act of Congress of June 21, 1860. Indeed, as has been seen by the confirmatory deed of 1871 to Watts, all of them then surviving, as well as the heirs of those who had died, expressly covenanted that they were the only heirs of Luis Maria Baca.

That Congress had full power to prescribe the mode of ascertaining the validity of claims of title to lands under Spanish and Mexican grants, and to provide for the forfeiture of such grants in the event the mode prescribed was not complied with, is well settled. Barker v. Harvey, 181 U. S. 481, 486, 487, 21 Sup. Ct. 690, 45 L. Ed. 963; Ainsa v. United States, 161 U. S. 208, 222, 16 Sup. Ct. 544, 40 L. Ed. 673; Astiazaran v. Mining Co., 148 U. S. 80, 13 Sup. Ct. 457, 37 L. Ed. 376; Botiller v. Dominguez, 130 U. S. 238, 9 Sup. Ct. 525, 32 L. Ed. 926; Tameling v. U. S. Freehold, etc., Co., supra. In the exercise of its duty and power in regard to such lands in the then territory of New Mexico, Congress passed the act of July 22, 1854, that has been referred to, by section 8 of which it made it the duty of the Surveyor General of that territory, under such instructions as should be given him by the Secretary of the Interior, to ascertain the origin, nature, character, and extent of all claims to lands situated in that territory, under the laws, usages, and customs of Spain and Mexico; and for that purpose to issue notices, examine witnesses, administer oaths, and perform all other necessary acts in the premises; to make a full report of all such claims as originated before the cession of the territory to the United States by the Treaty of Guadalupe Hidalgo, defining the various kinds of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States, and to make a report in regard to all the pueblos existing in the territory, showing the extent and locality of each, the number of their inhabitants respectively, and the nature of their title to the land—such report to be made in the form required by the Secretary of the Interior and to be laid before Congress for such action thereon as should be deemed just and proper, with a view to the confirmation of bona fide grants. By section 9 of the act the Secretary of the Interior was given authority to issue all needful rules and regulations for the full carrying into effect of the several provisions of the act, pursuant to which provisions the Secretary issued regulations August 25, 1854 (Public Domain, 394–398), which read in part as follows:

"Your first session will be held at Santa Fé. * * * You will commence your session by giving proper public notice of the same, in a newspaper of the largest circulation, in the English and Spanish languages, will make known your readiness to receive notices and testimony in support of the land claims of individuals derived before the change of government. You will require the claimant in every case—and give public notice to that effect—to file a written notice setting forth the name of the present claimant; name of the original claimant; nature of the claim, whether inchoate or perfect; its date; from what authority the original title was derived, with a reference to the evi-

239 F.—15

dence of the power and authority under which the granting officer may have acted; quantity claimed, locality, notice and extent of conflicting claims, if any, with a reference to the documentary evidence and testimony relied upon to establish the claims, and to show a transfer of right from the original grantee to the present claimant."

In accordance with such instructions due notice was given requiring claimants to present their claims, stating, among other things, the source and claim of their title (Public Domain, p. 404), in accordance with which notice the petition above set out was filed by John S. Watts on behalf of the heirs of Luis Maria Baca therein named. In the report of the Surveyor General on that petition returned to Congress, that officer reported that the Las Vegas grant made to Luis Maria Baca was valid and prior to a grant of the same land to the town of Las Vegas, which he also found to be valid. Subsequently the Senate Committee on Private Land Claims reported, May 19, 1860 (Rep. Com. No. 228, Sen. 36th Cong. 1st Sess.), that the grant to Baca "was in fee and is a genuine and valid title"; that the heirs of Baca had expressed a willingness to waive their prior title in favor of the settlers under the grant to the town of Las Vegas, and recommended that Congress so legislate as to accomplish that purpose. The grant made by Congress June 21, 1860, followed, embracing by its sixth section, among other lands, the tract of land here in controversy, "to the heirs of Luis Maria Baca, who make claim to the same tract of land as is claimed by the town of Las Vegas." In Maese v. Herman, 183 U. S. 572, 580, 581, 22 Sup. Ct. 91, 95 (46 L. Ed. 335), the Supreme Court, in speaking of the contest before the Surveyor General over the same tract of land, between the town of Las Vegas and those who made claim thereto under the Las Vegas grant, said:

"The petition of the Surveyor General of New Mexico describes the petitioners as 'residents of the town of Las Vegas and its vicinity,' and he manifestly regarded it a claim on behalf of the town, stated it from that standpoint, and reported it to Congress as a claim by the town of Las Vegas. The claim was confirmed by reference to the report, and the town was especially designated the claimant in section 6 of the confirmatory act. That it received confirmation at all may be because it was a claim by a town. Its legality might have been questioned. The claimants in their petition stated that their claim was disputed by Thomas Cabeza de Baca, and, reporting on that dispute, the Surveyor General said that testimony was introduced to show that the heirs of Baca protested in 1837 against the occupancy of the land by the claimants under the grant to Juan de Dios Maese, and that the claimants 'went upon the land knowing the existence of a prior grant' the Baca grant. The Surveyor General, however, did not assume to decide the dispute between the parties, but referred it to 'the proper tribunals of the country' and to Congress. Congress accommodated the dispute by a magnificent donation of lands to the heirs of Baca, and confirmed the original land to the town."

The dispute was between the respective claimants to the same piece of land, claimed to be covered by each grant, both of which grants were found to be valid, and that to Luis Maria Baca to be the prior one. Those who claimed under that prior grant waived their priority in favor of the town of Las Vegas, in consideration of which waiver Congress made to them a grant of other lands not covered by any Mexican grant, one of which tracts is that here in controversy. It is

obvious, we think, that the tract of government land so granted was to the claimants who waived their prior claim to the land granted by the Mexican government, and to none other, and such is, in effect, the express language of the act of Congress making the grant. Neither Antonio Baca nor any of his heirs ever having made any claim to any land granted by the Mexican government, they had no claim to waive, and manifestly waived none. It may be added that in cases of this character it seems to be the settled law that the confirmation of such foreign grants is to be deemed to be in favor of the person or persons claiming them. Connoyer v. Schaeffer, 22 Wall. 254, 22 L. Ed. 837; Bissel v. Penrose, 8 How. 317, 12 L. Ed. 1095; Strother v. Lucas, 12 Pet. 458, 9 L. Ed. 1137.

The other points made by counsel have been carefully considered, but we do not think they require special mention.

It results from what has been said that Joseph E. Wise and Margaret W. Wise acquired no interest in the land in controversy through the heirs of Antonio Baca, who had no interest therein to convey.

The cause is remanded, with directions to the court below to modify the decree in accordance with the views above indicated, and as so modified it will stand affirmed; the appellants Watts, Davis, and Bouldins to recover their costs.